Zhanna J. KARTSEVA,
Plaintiff-Appellant,

v.

DEPARTMENT OF STATE; Warren Christopher, Secretary of State; Sheldon Krys, Assistant Secretary of State for Diplomatic Security; Other Unknown Employees of the Department of State, Defendants-Appellees.

No. 93-5099.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 1994.

Decided Oct. 28, 1994.

As Amended on Denial of Rehearing Jan. 5, 1995.

Sheldon I. Cohen, Arlington, VA, argued the cause and filed the briefs for appellant.

Edith S. Marshall, Asst. U.S. Atty., Washington, DC, argued the cause for appellees. With her on the brief were Eric H. Holder, Jr., U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys. Mark E. Nagle, Asst. U.S. Atty., Washington, DC, entered an appearance.

Before WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In this case, Zhanna Kartseva appeals from the district court's dismissal of her claims against the Department of State ("State") and certain of its employees in their individual capacities. These claims arise from State's determination that Kartseva could not work on a State contract and her consequent discharge from Statistica, the private entity with which State had contracted. In the proceedings before the district court, Kartseva alleged, under the Administrative Procedure Act ("APA"), violation of procedural rights established by regulation and protected by the Due Process Clause of the Fifth Amendment.[1] She also brought a *Bivens*[2] action based on the Fifth Amendment against State employees in their personal capacities. The district court dismissed each count of Kartseva's complaint for failure to state a claim. This court has previously upheld the dismissal of the regulatory claims on the grounds that the regulations were inapplicable to the action taken against Kartseva.[3]

In dismissing Kartseva's APA claims, however, the district court failed to address Kartseva's Fifth Amendment claim against State. Nor did it address the merits of the constitutional claim in its dismissal of Kartseva's *Bivens* actions; it dismissed those claims for failing to meet this circuit's heightened pleading standard. Because this case was disposed of on a motion to dismiss prior to discovery, the record is spare. Based on the limited record before us, we conclude only that Kartseva alleged facts sufficient to give

rise to a possible due process liberty interest which may have been violated by State's action. Accordingly, Kartseva's Fifth Amendment claim survives a motion to dismiss and we remand the case to the district court for further proceedings.

## I. BACKGROUND

On October 4, 1990, Zhanna Kartseva was fired from her job at Statistica, a private employer doing government contract work, because State declared her ineligible to work on the State contract at Statistica and Statistica had no other work available. Kartseva alleges that she was told that she was being discharged because of the State determination, and that "if [she] could get the matter cleared up with the State Department, [Statistica] would gladly have [her] back."[4] An internal State memorandum proffered in the district court explains that Kartseva's disqualification was due to "several significant counterintelligence concerns."[5] To date, State has declined to provide Kartseva with an explanation of these concerns or opportunity to respond to the underlying charges.

Kartseva's profession is Russian language instruction and translation. Kartseva emigrated from the former Soviet Union, where she was a foreign language instructor, in 1977; she became a United States citizen in 1984. Since her emigration, she has worked, with short breaks, as a Russian translator and instructor in the United States, exclusively in government-related jobs: for the Defense Language Institute as an employee; for the Foreign Service Institute as a contract employee; and, most recently, for Statistica on government contract work.

Kartseva was employed by Statistica from October 4, 1989, until October 4, 1990. Her

---

1. *See* Administrative Procedure Act § 10(e), 5 U.S.C. § 706(2)(B) (1993) (reviewing court shall set aside agency action "found to be ... contrary to constitutional right"); 5 U.S.C. § 706(2)(D) ("found to be ... without observance of procedure required by law").

2. *See Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (allowing the recovery of damages for constitutional violations by federal officers acting in their individual capacities).

3. *See* Order of Dec. 13, 1993. For a discussion of those claims, see *infra* note 16.

4. Affidavit of Zhanna Kartseva ("Kartseva Affidavit") at 10, ¶ 30, *reprinted in* Joint Appendix ("J.A.") at 100.

5. Memorandum of Aug. 18, 1990, *reprinted in* J.A. at 48.

offer of employment from Statistica was to work "on our Washington Processing Center ["WPC"] contract." [6] State established the WPC to implement a Presidential Decision regarding the procedures for processing Soviet refugees. The WPC is run by State under contract to Statistica.[7] Its function is to process and track applications of individuals seeking entry to the United States under the Soviet refugee immigration program, and it handles over 300,000 requests for refugee status annually. The center and its work are "unclassified but sensitive." [8] In addition to the Statistica staff, thirteen Immigration and Naturalization Service ("INS") officers are located at the WPC.

For the first two months of her employment at Statistica, Kartseva worked in data entry. Subsequently, a separate section was established to answer telephone inquiries and correspondence, and Kartseva primarily performed Russian translation in this section. Shortly after Kartseva began work at Statistica, an INS official contacted State about the Statistica project. He wrote that he assumed that WPC employees "will have the access necessary to alter, add or delete" the computerized case records and expressed concern that no background checks had been performed on WPC employees.[9] In response to this concern, Royce Fichte, the State Director of the WPC, wrote to State's Diplomatic Security Service stating that "[t]his is a highly visible program on the Hill and one of the Administration's and in turn the Departments [sic] priorities," and requesting "that the contract employees receive at least some security review such as a National Agency Check." [10]

Subsequently, these National Agency Checks ("NACs") were performed under the direction of Andrea Jones. Pursuant to the NAC, Kartseva completed a questionnaire and submitted her fingerprints to State. In addition, State conducted investigative checks of her records at various federal agencies, including State, the Federal Bureau of Investigation, the Department of Defense, the Office of Personnel Management, and the Central Intelligence Agency. At the conclusion of this background check, State informed Statistica that Kartseva was "ineligib[le] for assignment to a DOS contract or project," and asked Statistica to "act on" this determination.[11] Based on State's communication, Statistica terminated Kartseva.[12] An internal memorandum establishes that the State determination was based on "several significant counterintelligence concerns raised during the conduct of background investigations and pre-employment screening conducted on SUBJECT by other U.S. Government agencies," [13] but provides no information on the content of those counterintelligence concerns. Kartseva remains unaware of the reason for her disqualification, and alleges that she has been unable to find new employment.[14]

## II. DISCUSSION

At issue in this appeal are Kartseva's Fifth Amendment claims against State itself and against several of its officials in their personal capacities. The gravamen of these charges is that State and State employees "caused plaintiff's employment with Statistica to be terminated, and interfered with her opportunity to obtain future employment in violation of . . . her due process rights under the Fifth Amendment to the United States

---

**6.** *See* Letter from John A. Hakola to Zhanna Kartseva of Oct. 4, 1989, *reprinted in* J.A. at 120.

**7.** Memorandum of Dec. 7, 1989, *reprinted in* J.A. at 43.

**8.** *See* Decl. of Andrea Jones ¶ 3, *reprinted in* J.A. at 38. The record provides no further explanation of this designation.

**9.** *See* Letter from Luis R. del Rio to Ambassador Robert Barry, *reprinted in* J.A. at 41–42.

**10.** Declaration of Royce Fichte ¶ 3, *reprinted in* J.A. at 35; Memorandum of Dec. 7, 1989, *reprinted in* J.A. at 43.

**11.** Memorandum of Aug. 29, 1990, *reprinted in* J.A. at 37.

**12.** Letter from John A. Hakola to Zhanna Kartseva of Oct. 4, 1990, *reprinted in* J.A. at 108.

**13.** Memorandum of Aug. 18, 1990, *reprinted in* J.A. at 48.

**14.** Kartseva Affidavit ¶ 34, *reprinted in* J.A. at 101.

Constitution." [15] We first address her claim against State.

## A. Liberty Interest

■ We think that Kartseva has alleged sufficient facts regarding violation of her liberty interest by State to survive a motion to dismiss. Because, however, it is not possible to ascertain the precise scope and import of the State disqualification from the present record, even as supplemented by a letter filed by State at our request, we are unable to determine for sure whether State's disqualification actually implicated a due process liberty interest. Accordingly, we remand for further findings on the nature and scope of the State disqualification. The critical question on remand is whether State's disqualification has worked a change in Kartseva's status under law, either by (a) automatically excluding her from a definite range of employment opportunities with State or other government agencies; or (b) broadly precluding her from continuing in her chosen career of a Russian translator. The district court's exploration should proceed along the following lines.

In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court ruled that the mere failure to rehire a nontenured teacher did not implicate a liberty interest. In so holding, the *Roth* Court observed that if, in failing to rehire, the government "imposed ... a stigma or other disability that foreclosed [one's] freedom to take advantage of other employment opportunities," 408 U.S. at 573, 92 S.Ct. at 2707, a liberty interest would be implicated. In *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), and *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), however, the Court cautioned that government defamation, standing alone, cannot be the basis of an "employment foreclosure" liberty claim. Thus, in *Paul,* the Supreme Court held that charges of governmental defamation, "standing alone and apart from any other governmental action," did not state a due process claim. 424 U.S. at 694, 96 S.Ct. at 1157. *Siegert* affirmed that "[d]efamation, by itself, is ... not a constitu-

tional deprivation," and held that when, as in Siegert's case, an alleged governmental defamation is uttered apart from any particular action involving the subject's employment, *i.e.,* subsequent to a voluntary resignation, it cannot be the basis for a due process claim, even where that defamation "undoubtedly ... impair[s one's] future employment prospects." 500 U.S. at 233–34, 111 S.Ct. at 1794.

Under this line of cases, a government action that potentially constrains future employment opportunities must involve a tangible change in status to be actionable under the due process clause. If a government action does constitute an adjudication of status under law, the underlying factual and legal determinations are subject to due process protections. Justice Frankfurter explained in concluding that adjudications of "subversive" status via a procedure of *"ex parte* summary designation" contravened due process:

> That a conclusion satisfies one's private conscience does not attest its reliability. The validity and moral authority of a conclusion largely depend on the mode by which it was reached. Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done.

*Joint Anti–Fascist Committee,* 341 U.S. at 171–72, 71 S.Ct. at 649 (Frankfurter, J., concurring). *See also id.* at 179, 71 S.Ct. at 652 (Douglas, J., concurring) ("It is procedure that spells much of the difference between rule by law and rule by whim or caprice."); *id.* at 186, 71 S.Ct. at 652 (Jackson, J., concurring) ("To promulgate with force of law a conclusive finding of disloyalty, without [a] hearing at some stage before such finding becomes final, is a denial of due process of law.").

Based on the present record and our precedents, there appear to be two ways in

---

**15.** *See* Complaint at 8–9, *reprinted in* J.A. at 16–17.

which State's action might have changed Kartseva's status and thus implicated a liberty interest. First, if State's action formally or automatically excludes Kartseva from work on some category of future State contracts or from other government employment opportunities, that action changes her formal legal status and thus implicates a liberty interest. Second, if State's action does not have this *binding* effect, but nevertheless has the *broad* effect of largely precluding Kartseva from pursuing her chosen career as a Russian translator, that, too, would constitute a "status change" adequate to implicate a liberty interest. Without further exploration, of course, we have no way of knowing if State's action brought about either of these status changes.

### 1. *Binding Disqualification*

As the district court found, no *official* debarment action (that is, action under the published rules governing public contracting) was taken against Kartseva—indeed, had it been, she would have been entitled to procedural safeguards mandated by regulation.[16] If, however, Kartseva can prove that State's action was, in fact, a determination of her legal eligibility to work on future State contracts, then she has a cause of action for violation of her due process liberty interest. *See Reeve Aleutian Airways v. United States,* 982 F.2d 594, 598 (D.C.Cir.1993) (suspension from one government department implicates a liberty interest).

The present record is cloudy as to the extent of the State disqualification. The three internal State memoranda that discuss Kartseva's disqualification do not demark the scope of her ineligibility for future government contracts. Two are directed to the

State official overseeing the Statistica project: the first states that Kartseva has been found "unsuitable for further DOS contract performance"[17]; the second sustains "our previous position of her ineligibility for assignment to a DOS contract or project."[18] The third is based on an internal review of the decision by State's Office of Counterintelligence Programs and confirms that "we strongly recommend she not secure a position in support of any Department of State contract."[19] Whether these memoranda disqualify Kartseva from only the particular State contract at Statistica for which Kartseva was hired, from all Statistica contracts with State, or from all future State contracts with any employer remains to be clarified.

On remand, then, the district court must determine if State made a binding determination to disqualify Kartseva from any future contracts other than the particular State contract with Statistica on which Kartseva was working. If State's determination was intended to exclude Kartseva from future government work—on State's contracts with Statistica or State's contracts more generally—then that determination would effect a change in status and implicate a liberty interest.

Alternatively, if State's disqualification is available to future potential government employers, and the fact of State's disqualification would automatically preclude Kartseva from meeting eligibility criteria for other jobs, that would also constitute a status change of due process import. *See Old Dominion Dairy v. Secretary of Defense,* 631 F.2d 953, (D.C.Cir.1980) (contractor has a

---

**16.** *See* Memorandum Opinion of Sept. 23, 1992 at 7, *reprinted in* J.A. at 355. In the proceedings below, Kartseva sought relief under the State regulations that establish procedures for formal debarment, *see* Contractor Qualifications: Debarment, Suspension, and Ineligibility, 48 C.F.R. § 609.406–3 (1993), and denial of security clearances to government contract employees, *see* Defense Industrial Personnel Security Clearance Program, 32 C.F.R. pt. 155 (1993). However, as the district court found—in parts of its decision previously affirmed by this court, *see* Order of Dec. 13, 1993—these were not the actions taken against Kartseva.

Had she been denied a security clearance, she would have been entitled to extensive procedural safeguards, including a written statement of rea-

sons, a hearing, and the opportunity to cross-examine adverse witnesses. *See* 32 C.F.R. pt. 155, App. A. Likewise, had she been debarred, she would have been entitled to notice, a meeting with the debarring official, and a hearing. *See* 48 C.F.R. § 609.406–3.

**17.** Memorandum of July 2, 1990, *reprinted in* J.A. at 46.

**18.** Memorandum of Aug. 29, 1990, *reprinted in* J.A. at 37. This memorandum was given to Statistica. *See* Declaration of Royce Fichte ¶ 9, *reprinted in* J.A. at 36.

**19.** Memorandum of Aug. 18, 1990, *reprinted in* J.A. at 48.

liberty interest claim due to debarment when government agency made a written finding of "nonresponsibility," placed it in a permanent file accessed by future government contract decisionmakers, and a finding of responsibility is a prerequisite under the Defense Acquisition Regulations to the award of a contract); *see also Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 175, 71 S.Ct. 624, 650–51, 95 L.Ed. 817 (1951) (Douglas, J., concurring) (finding a due process interest implicated by a government determination of "subversive" status where determination brought regulatory agency penalties in its wake). We emphasize that to demonstrate a status change of this sort, Kartseva must show that her disqualification from future opportunities is automatic or formal, not simply that her having failed a National Agency Check places her at competitive disadvantage relative to other applicants for these positions.

Although there is evidence that State's disqualification of Kartseva for the Statistica contract is available to other government agencies, the record does not indicate what effect that disqualification will have on her eligibility for other government jobs.[20] In a supplemental letter filed after oral argument, State indicates that the "results" of its investigation—its disqualification from the Statistica contract—will be subject to "routine use" dissemination to other federal agencies that are considering hiring Kartseva or contracting with her. Specifically, State explains that its investigation of Kartseva was one that "would ordinarily give rise to the establishment of an investigatory record concerning the individual," and that the "dissemination of the 'results' of a NAC would occur primarily in the context of a 'routine use' under the [Privacy] Act." Letter from State to Clerk of the Court of Sept. 16, 1994, at 3. Under State "routine use" provisions, information in security records is made available to other federal agencies that, *inter alia,* inquire "pursuant to law or Executive Order in order to make a determination of general suitability for employment or retention in employment, to grant a contract or issue a license, grant, or security clearance." Privacy Act Issuances, Volume II, 1991 Comp., p. 499.

In short, if State's insistence that Kartseva be removed from the Statistica contract with State proves to be an automatic disqualification from all Statistica contracts with State, from all State contracts of some predetermined type, from *all* State contracts, or from a predetermined class of contracts or jobs with agencies other than State, then it will have effected a change in her status sufficient to implicate a liberty interest, with attendant needs for due process protections.

### 2. *Preclusion From Chosen Profession*

The district court must alternatively consider whether State's disqualification interferes with Kartseva's constitutionally protected "right to follow a chosen trade or profession." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895–96, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961). Under this line of precedent, if Kartseva can show that State's action precludes her from pursuing her profession as a Russian language translator, she will have identified a cognizable liberty interest. *See Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959) (revocation of a security clearance possibly implicates Fifth Amendment liberty interest where action "has seriously affected, if not destroyed, [plaintiff's] ability to obtain employment in the aeronautics field"); *Doe v. Department of Justice,* 753 F.2d 1092, 1111–12 (D.C.Cir.1985) (liberty interest threatened where DOJ spreads charges of lawyer's incompetence and untrustworthiness to public and private lawyers in her specialty). On the other hand, if Kartseva has merely lost one position in her profession but is not foreclosed from reentering the field, she has not carried her burden in this line of cases. *See Cafeteria Workers,* 367 U.S. at 895–96, 81 S.Ct. at 1748–49.

Again, we are unable to tell from this record what effect disclosure of her file would have on Kartseva's future employment opportunities as a Russian translator. Precisely because the "counterintelligence concerns" underlying the disqualification are unknown, it is impossible to speculate on

---

**20.** We know, for instance, that the Federal Civilian Personnel Security Program "requires that investigations be conducted on all persons entering the Federal civilian service." FEDERAL PERSON-NEL MANUAL ch. 732 at 732–3. We do not know whether State's disqualification of Kartseva would preclude her from clearing such an investigation.

whether that disqualification implicates Kartseva's general employability in her field. To some extent, of course, this question relates to the scope of the disqualification, a fact still unknown. If, for instance, the disqualification encompasses all State contracts, that would suggest that the finding of "counterintelligence concerns" might be sufficiently stigmatic to work a similar disqualification through much of Kartseva's field in Russian language translation, depending on the range of jobs that are available for persons skilled in Russian translation. If the State disqualification is narrower, then the determination may not be broadly preclusive.

### 3. Conclusion

As this discussion suggests, the record leaves at least three important questions to be resolved by the district court on remand. These are: (1) the scope of State's express disqualification—in particular, whether State's internal recommendation that Kartseva "not secure a position in support of any Department of State contract," refers only to the Statistica contract from which Kartseva was removed, to all Statistica contracts with State, or, indeed, to *any* State contract; (2) the extent to which State's action as to Kartseva would normally be available to and would legally affect other government agencies or private employers in their decisions whether to employ her or permit her to work on government contracts; and (3) the extent to which the disqualification will affect Kartseva's ability to pursue her vocation as a Russian translator.

Because these questions are critical to the resolution of whether a due process liberty was implicated, the case is remanded for further proceedings.

### B. The Bivens Claim

■ Kartseva filed her *Bivens* claims against James A. Baker, Secretary of State, Sheldon Krys, Assistant Secretary of State for Diplomatic Security, and "other unknown employees of the Department of State."

Complaint at 8, *reprinted in* J.A. at 16. Applying this circuit's heightened pleading standard for *Bivens* actions, *see Hunter v. D.C.,* 943 F.2d 69 (D.C.Cir.1991), the district court concluded that the complaint failed to specify actions taken by the "named government officials," Memorandum Opinion of Sept. 23, 1992, at 11, *reprinted in* J.A. at 359, but did not specifically address its sufficiency with respect to the unnamed officials.

The district court correctly dismissed the *Bivens* claims against defendants Baker and Krys. Indeed, as in *Cameron v. Thornburgh,* 983 F.2d 253 (D.C.Cir.1993), the "district court did not even need to apply the heightened pleading standard." Because "[t]he complaint itself did not even allege that [Baker] and [Krys]' had participated in any decision or approved any policy that related to the case," *id.* at 258, Kartseva simply failed to state a claim against Baker and Krys.

■ With respect to the unnamed employees, however, the district court erred in deciding the heightened pleading standard issue before deciding the *threshold* " 'essentially legal question whether the conduct of which the plaintiff complains violated clearly established law,' " *Siegert,* 500 U.S. at 233, 111 S.Ct. at 1793–94 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)), *i.e.,* whether Kartseva alleged the violation of a clearly established constitutional right. Where, as here, the resolution of the threshold question of the existence of a clearly established constitutional right requires information on the nature and effects of the government action that is exclusively within the domain of the government, limited discovery may be appropriate in order to determine that threshold issue. Because we remand the constitutional question, we do not now decide whether the *Bivens* claims can survive a claim of qualified immunity.[21]

In the event, however, that the district court finds the existence of a clearly established liberty interest, we note that this circuit's heightened pleading standard has *two* levels. The first level applies to all *Bivens* or

21. The Supreme Court has emphasized that qualified immunity offers immunity from *suit,* not simply from liability, and that, accordingly, "even such pretrial matters as discovery are to be avoided if possible." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985). It has also recognized, however, that where the parties present a factual

dispute about the challenged conduct, and the merits of the qualified immunity question turn on that dispute, "discovery may be necessary before [a] motion for summary judgment on qualified immunity grounds can be resolved." *Anderson v. Creighton,* 483 U.S. 635, 646–47 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523. Kartseva's case presents a slightly different question, be-

§ 1983 claims and demands that plaintiffs plead the facts surrounding the alleged violation with sufficient "detail[ ] to enable the district court to decide at the outset whether [the] action may proceed to discovery and trial" over a qualified immunity defense. *Hunter,* 943 F.2d at 75. The second level of our heightened pleading standard applies only to claims in which the outcome depends on the defendant's state of mind, and it demands direct evidence of intent. *See Kimberlin v. Quinlan,* 6 F.3d 789 (D.C.Cir. 1993).[22] In this case, the district court seems to have mistakenly applied the second, higher, level, when, in fact, Kartseva's claims do not depend on the *intent* of the State employees. On remand, if it reaches the issue, the district court should apply the less stringent level of our heightened pleading standard to Kartseva's claims against the unnamed employees—since identified as Royce Fichte and Andrea Jones.[23]

### III. CONCLUSION

The decision of the district court is affirmed in part and reversed in part. The dismissal of defendants James A. Baker and Sheldon Krys is affirmed. The dismissal of the remaining defendants and the Fifth Amendment claim against State is reversed. The case is remanded for further proceedings consistent with this decision.

*So ordered.*

---

cause the material facts are *inaccessible* rather than in dispute. Because, in this case, discovery into the currently inaccessible facts will proceed under Kartseva's APA claim against State, independent of the *Bivens* claims, we see no harm in postponing decision on whether the *Bivens* defendants are entitled to qualified immunity until this independent discovery has unearthed the relevant facts. Because, moreover, discovery can proceed on that independent basis in this case, we do not now decide the broader question of the permissible scope of discovery into facts material to the qualified immunity issue.

**22.** The Ninth Circuit's heightened pleading standard, by contrast, applies *only* to intent-based claims. *See Mendocino Environmental Center v. Mendocino County,* 14 F.3d 457, 462 (9th Cir. 1994) ("Where the constitutional tort does not require an inquiry into the defendant's state of mind, however, the heightened pleading standard is inapplicable.").

**23.** Kartseva moved to amend her complaint to add Royce Fichte and Andrea Jones as defendants once she learned from State's May 15, 1991, Motion to Dismiss that they were the "unknown employees." The motion to amend was pending when the case was dismissed and will be before the district court on remand.