**Jacqueline P. TAYLOR, et al., Appellants,**

v.

**RESOLUTION TRUST CORPORATION, et al., Appellees.**

**No. 95–5001.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1995.

Decided June 23, 1995.

Robert C. Seldon, Washington, DC, argued the cause for appellants. With him on the briefs was Joanne Royce.

Marina U. Braswell, Asst. U.S. Atty., Washington, DC, argued the cause for appellees. With her on the brief were Eric H. Holder, Jr., U.S. Atty., and R. Craig Lawrence, Asst. U.S. Atty.

Before: SILBERMAN, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

This is an interlocutory appeal from a denial of preliminary injunctive relief. The four individual plaintiffs are former employees of the Resolution Trust Corporation who allege that they suffered illegal retaliation for publicly exposing instances of RTC mismanagement and waste. The fifth plaintiff, the Government Accountability Project, is a self-described public-interest group dedicated to supporting government employees who come forward with reports of official misconduct. All five plaintiffs sought a preliminary injunction barring the RTC from persisting in the alleged harassments of the four individual plaintiffs and from taking action against other would-be whistleblowers who have not come forward or joined the suit for fear of agency retaliation.

We affirm the district court's denial of the injunction. The motion is moot with respect to three of the individual plaintiffs, who have left the RTC and have not alleged any retaliation that would extend beyond the period of their employment. The fourth individual plaintiff *has* alleged post-termination retaliation, but in light of the district court's specific findings of fact—findings to which we owe deference—we find he has not adequately shown that he will succeed on the merits of his suit or suffer irreparable injury in the absence of interim relief. Finally, although we find that the group plaintiff has standing to bring one of its claims, its motion for preliminary injunctive relief fails for want of an ongoing injury that the injunction would relieve.

## I.

The four individual plaintiffs worked for the RTC in different capacities and in different offices, and they challenge different agency actions. Before their reassignment and later resignation, Jacqueline Taylor and Bruce Pederson were both senior attorneys in the Professional Liability Section of the RTC's Western Regional Office in Denver. In 1992, they began protesting a reorganization of their office, claiming that it was both grossly mismanaged and designed to gut their section just as it was getting ready to bring several large fraud suits against fiduciaries of failed savings and loan institutions. In addition to preparing briefings on the subject for RTC senior management, the agency's Inspector General's Office, and the General Accounting Office, Pederson and Taylor testified several times before the Senate Banking Committee, and their testimony received substantial publicity. They allege that as punishment for going public with their complaints, the RTC eliminated their positions and "exiled" them to another unit, where they were given make-work duties and physically isolated from other agency employees. They further complain that their applications to return to substantive management positions were summarily denied, that their mail and computer files were opened and monitored, and that their superiors slandered them to other employees and took action against co-workers who continued to socialize with them. In addition, Taylor says that the RTC General Counsel put her under a "gag order" by commanding her in a memorandum not to speak publicly about any matter concerning the agency without prior approval. In response, the RTC argues that it downsized the Denver office in anticipation of having to phase out the entire agency's operations by the end of 1995, that Pederson's and Taylor's complaints were simply efforts to preserve their own status during the reorganization, that the two were less qualified than the candidates hired for the new positions for which they applied, and that the supposed "gag order" was merely a reminder to Taylor of her ethical obligations as an attorney not to disclose client confidences.

The third individual plaintiff, Juan Luis Burgos–Gandia, was a litigator in the RTC's Dallas field office. Burgos alleges that he was assigned to "problem cases" and temporarily stripped of all responsibilities after he complained to RTC management and the GAO about overbillings by one of the agency's outside law firms. The RTC responds that Burgos's assignments changed only as a

result of a general reallocation of work in his division. In addition, the agency accuses Burgos of severe misconduct with respect to one of his cases. Burgos's supervisors asked him to have outside counsel move to vacate a default judgment entered against the agency, but Burgos disagreed with this strategy and instead ordered the motion withdrawn; when his superiors countermanded the order, Burgos filed what he called an "informative motion" with the court detailing his dispute with his supervisors and, according to the RTC, disclosing client confidences and litigation strategy in an attempt to avoid being sanctioned for his own conduct in the episode. The RTC initially notified Burgos that he would be fired for his insubordination but later placed him on paid administrative leave; in December 1994, the agency ultimately decided not to terminate Burgos but instead to demote him by two pay grades.

Richard Dunn, the fourth individual plaintiff, was employed for about two years by an RTC office in Pennsylvania as an asset manager, overseeing the consolidation of banks taken over by the RTC and the sale of their properties to other banks. Dunn discovered that an outside contractor had overcharged the agency and brought the matter to the attention of RTC management. Several months later, Dunn failed to receive an expected promotion to a higher pay grade; he alleges that he was punished for exposing a favored contractor's wrongdoing, while the agency points to an unfavorable performance review he received for his previous year's work. The RTC allowed Dunn's temporary appointment to lapse, citing his poor interpersonal skills, inflexibility, and poor judgment.

Dunn's problems with the RTC continued after his employment ended. Shortly after his departure, private security officers began conducting surveillance on him; these detectives presented homemade "RTC Special Agent" credentials to local police who investigated when Dunn reported that he was being followed by unknown men. An investigation of the incident by the RTC Inspector General concluded that there had been a miscommunication between the private detective agency and the RTC: the agency had retained the firm to provide extra security at some upcoming meetings that it thought Dunn might disrupt, but it had never authorized surveillance of Dunn or the use of false credentials.

Dunn also alleges that he applied for a number of jobs after leaving the agency but did not find employment until he was hired as an asset manager by Coopers & Lybrand in May 1994. He was fired on his fifth day of work. When Dunn, through counsel, pressed Coopers for an explanation, the firm replied that "sources within the RTC" had informed it that Dunn had threatened employees at the agency, that he had claimed to have a gun, and that "[t]he situation [had become] so serious that at one meeting of senior RTC officials, four armed guards were hired by the RTC for protection." Coopers also reported that the agency had told the firm it was "specifically prohibited from using Mr. Dunn on any RTC related work." Dunn denies that he ever engaged in such conduct, and the RTC does not now suggest otherwise. The agency asserts that it never put Dunn on any formal list of suspended or excluded contractors nor adopted any informal policy of excluding him from work on RTC contracts; it does not otherwise challenge his depiction of the Coopers incident.

Joining these four individual plaintiffs is the Government Accountability Project ("GAP"), an organization that represents individual whistleblowers and uses the information they provide to mount public education campaigns about government waste, fraud and misconduct. One of GAP's projects has been to challenge alleged mismanagement in the RTC; as part of this campaign, the group has helped RTC employees testify before congressional banking committees and has helped to draft and pass RTC-reform and whistleblower-protection legislation. As discussed below in greater detail, GAP claims that the RTC's retaliation against would-be whistleblowers has interfered with its attempts to communicate with willing speakers inside the agency.

The five plaintiffs filed a complaint alleging that the RTC's actions violated 12 U.S.C. § 1441a(q), which prohibits the RTC and its agents from discriminating against employees who disclose agency or contractor wrong-

doing to certain overseeing authorities. (Both parties refer to this provision as the RTC Whistleblower Act, as will we.) In addition, they assert numerous constitutional violations: for example, Taylor alleges that the General Counsel's alleged "gag order" was a prior restraint on her speech violating the First Amendment, GAP argues that the agency's conduct violated its First Amendment rights to receive information from willing speakers, Dunn maintains that the RTC's contacts with outside employers following his termination deprived him of a Fifth Amendment liberty interest, and Burgos argues that his being placed on administrative leave from his government employment denied him a property interest without due process. The plaintiffs moved for preliminary injunctive relief, which the district court denied on the grounds that they had failed to demonstrate irreparable injury and were unlikely to succeed on the merits of their claims. They filed an interlocutory appeal, which we expedited.

## II.

### A. Mootness

■ A federal court's Article III power to hear disputes extends only to live cases or controversies. A request for injunctive relief remains live only so long as there is some present harm left to enjoin. See *Renne v. Geary,* 501 U.S. 312, 320–21, 111 S.Ct. 2331, 2338, 115 L.Ed.2d 288 (1991) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.") (ellipses in original) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974)); *Christian Knights of the Ku Klux Klan v. District of Columbia,* 972 F.2d 365, 369 (D.C.Cir.1992). Once the movant is no longer in harm's way, a motion for an injunction becomes moot. See, e.g., *Craig v. Boren,* 429 U.S. 190, 192, 97 S.Ct. 451, 454, 50 L.Ed.2d 397 (1976) (request for injunction against enforcement of alcohol consumption restriction applicable only to males aged 18 to 20 becomes moot once plaintiff turns 21); *Ringgold v. United States,* 553 F.2d 309, 310 (2d Cir.1977) (ca-

det's suit to enjoin military academy's application of honor code against him becomes moot when he resigns from academy before appeal and thereby removes himself from code's coverage).

■ For this reason, while a court may enjoin an employer from retaliating against its current employees who are challenging the employer's wrongdoing, e.g., *Wagner v. Taylor,* 836 F.2d 566, 570–75 (D.C.Cir.1987), and former employees can recover damages for past retaliation suffered while employed, a request for an injunction against future retaliation in the workplace normally becomes moot once the employees no longer work for that employer. In *Bois v. Marsh,* 801 F.2d 462 (D.C.Cir.1986), a former Army audiologist alleged that her supervisor in the military had discriminated against her and had retaliated when she complained; she sought both damages and an injunction. Although we held that her claims for damages were still live and proceeded to analyze them on the merits, 801 F.2d at 468–71, we dismissed her request for injunctive relief as moot. Because the plaintiff "voluntarily resigned from the Army and ... asserted no intention of returning to active duty," she was effectively seeking "reform of military procedures to which she [was] no longer subject." *Id.* at 466. She thus "ha[d] nothing to gain from the equitable relief she [sought]," making her claim moot. *Id.* We further held that the plaintiff's injuries were not "capable of repetition" such that they fell within the exception to the mootness requirement for cases "capable of repetition, yet evading review": the plaintiff had no "reasonable expectation" that she would ever again be subject to the Army's grievance procedures, as she did not intend to rejoin the armed forces and would not be recalled to service except in the event of a national emergency. *Id.* at 466–67 (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam)).

■ The individual plaintiffs in the present case are in a similar difficulty. All have left the RTC. Dunn's temporary contract was not renewed, and Burgos resigned in January 1995, just after this appeal was filed.

In addition, two months before oral argument, Pederson and Taylor took advantage of a Voluntary Separation Incentive Payment program to resign from the RTC; these resignations became effective shortly after the case was argued. None of these four has indicated that he or she plans to work again at the RTC. Nor is such reemployment likely, given that the agency is scheduled to be phased out of existence by the end of this year. See 12 U.S.C. § 1441a(m)(1). In short, these plaintiffs have no "reasonable expectation" of returning to the RTC and being subjected to the same treatment as before. See *James v. Department of Health and Human Svcs.*, 824 F.2d 1132, 1136 (D.C.Cir.1987) (for plaintiff to have "reasonable expectation" that past injury will recur, "there must exist not merely a physical or theoretical possibility of recurrence, but rather a demonstrated probability") (internal quotation marks omitted).

Of the four individual plaintiffs, only Dunn has alleged that the RTC retaliated against him after the end of his employment with the agency, specifically, by wrongfully conducting surveillance and making false statements to potential employers. The other plaintiffs' affidavits (and the remaining sections of Dunn's submissions) are filled with allegations of adverse hiring and compensation decisions, offensive work assignments, and other workplace mistreatment suffered at the hands of supervisors and co-workers. But there is nothing indicating that these actions could continue once the plaintiffs left the RTC. Taylor, to be sure, argues that the General Counsel's memorandum (the so-called "gag order") subjects her First Amendment rights to continuing restraint, but we cannot see how it would have that effect: the memorandum simply (and rather vaguely) invokes "[t]he general principle that attorneys do not discuss client matters with the media absent express client permission" and notes that her prior unauthorized disclosures "impact[ed] detrimentally on the ability of the RTC to efficiently carry out its mission, on the public image of the RTC, and on [its] morale." As Taylor no longer works for the RTC and her statements cannot be perceived as official agency pronouncements, she no longer needs to clear her speech with the agency except to the extent that she is *ethically* obligated not to disclose the confidences of her past client—a wholly non-controversial obligation incumbent upon *every* attorney; we see nothing in the General Counsel's memorandum purporting to impose any further obligation on Taylor after the end of her RTC employment, a scenario that the memorandum, so far as appears, does not even consider. Finally, the individual plaintiffs other than Dunn may not just point to his charges of post-termination retaliation and assert without more that they too will be subjected to continuing harassment: Dunn's allegations are specific to his own situation and do not support an inference that the *other* offices of the RTC would take similar actions against any of the other plaintiffs now that they have left the agency. In sum, the individual plaintiffs are no longer with the agency, there is no serious prospect of their return, and (with the exception of Dunn) they make no showing of a risk of continuing retaliation; their requests for preliminary injunctive relief would therefore seem moot.

■ Plaintiffs argue, however, that the RTC's misconduct effectively forced them to resign their positions and that our using the resignations to find their claims moot would enable the agency to benefit from its wrongdoing. Some reasoning along these lines may be implicit in *Bois v. Marsh,* where we considered (though ultimately rejected as factually unsupported) the plaintiff's contention that she was forced to resign from the Army by her discriminatory superior's continuing position of authority. See 801 F.2d at 466 n. 5. And more generally, mootness and vacatur jurisprudence frequently recognizes the risk that parties might game the system to avert binding judicial pronouncements. Thus, a defendant cannot moot the case for an injunction against it merely by *ceasing* its wrongful conduct unless it also shows that there is no reasonable expectation that it will repeat the wrong. *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953); see also *United States v. Oregon State Medical Soc'y,* 343 U.S. 326, 333, 72 S.Ct. 690, 695–96, 96 L.Ed. 978 (1952) (discounting "protestations of repentance and reform, especially

when abandonment seems timed to anticipate suit"); cf. *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* —— U.S. ——, —— – ——, 115 S.Ct. 386, 391–92, 130 L.Ed.2d 233 (1994) (describing availability of vacatur upon mootness as contingent on equities of litigants' procedural postures on appeal and noting that "a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks") (citations and quotation marks omitted). By the same token, wrongdoing employers should not be able to moot disputes unilaterally by *increasing* their offensive conduct to the point where the victim is shoved out of harm's way—assuming, however, that the shove is itself illegitimate and that damages would be an inadequate substitute relief for the wrongdoing.

■ These last caveats are critical. Employer misconduct causing an end of the employment relationship should not undermine the otherwise resulting mootness unless it rises to the level of an unlawful dismissal of the complainants, actual or constructive. An employee who is mistreated on the job but who *voluntarily* chooses to leave the workplace permanently bears responsibility for the dispute becoming moot and must forego injunctive relief in favor of damages. Cf. *Ringgold,* 553 F.2d at 310 and n. 2 (deeming cadet's resignation from academy voluntary and holding suit over disciplinary code moot, notwithstanding allegations that cadet was subject to unfair discipline and that academy induced resignation by offering possibility of reapplying). Furthermore, the burden of demonstrating this improper dismissal rests with the employee. Cf. *Bois,* 801 F.2d at 466 n. 5 (declining to excuse mootness because of *plaintiff*'s failure to proffer evidence and present more than "vague allegations" of an unlawful constructive discharge).

■ Of the four individual plaintiffs, only Burgos and Dunn have made specific representations to the court beyond their arguments on brief challenging their terminations as wrongful. Because Dunn had left the RTC before the filing of the complaint, his initial submissions to the district court fully laid out his challenges to his dismissal. The district court thoroughly reviewed these sub-missions as part of its decision to deny preliminary injunctive relief. It found "no substantial likelihood that Dunn's performance evaluation for August 1991–August 1992 was in retaliation for his complaints about client overcharging" and it credited "the judgment of Dunn's superiors with respect to his poor judgment and interpersonal skills." Accordingly, it "conclude[d] that Dunn ha[d] failed to demonstrate a substantial likelihood of any causal link between his alleged whistleblowing and his termination." These findings were adequately supported by the detailed descriptions of deficient job performance laid out in the August 1991–August 1992 evaluation, which was co-signed and concurred in by two of Dunn's supervisors; by a subsequent performance review, which found that although Dunn's work and attitude had improved some, his judgment skills were still below average and "he still ha[d] much to learn in foreseeing how people will react" to his various actions; and by two independent reviews of the performance evaluations—both concluding that Dunn had suffered no retaliation—undertaken by the Field Operations Officer and the vice-president of the Operations Division as part of the agency's internal grievance process. As we cannot say that the court's findings were clearly erroneous, see *City of Las Vegas v. Lujan,* 891 F.2d 927, 931 (D.C.Cir.1989), we cannot find that Dunn has met his burden of proving that the RTC's failure to renew his contract was a wrongful and retaliatory discharge.

■ Burgos, on the other hand, was still employed by the RTC at the start of the litigation and resigned only after the district court's denial of preliminary relief. He did, however, submit a copy of his resignation letter to this court in conjunction with the plaintiffs' emergency motion to expedite the appeal. Burgos's letter details the conditions that motivated his resignation, which he characterizes as a constructive discharge: he cites the dispute over his alleged insubordination during litigation, his being placed on administrative leave for nine months following the dispute, and his eventual two-grade demotion. Although this letter was filed after the district court's opinion, we still have the benefit of that court's findings concerning

all the events Burgos cites as premises for his resignation. According to the court, the disciplinary measures imposed by Burgos's superiors "only resulted when [Burgos] refused to accept their tactical decision [during the contested litigation] and risked placing his client's interests in jeopardy by filing his 'Informative Motion' out of an instinct for self-preservation, i.e., to avoid the stain of sanctions by the ... court." It concluded that Burgos's "claim that defendants took such action in retaliation for 'whistleblowing' strains credulity." Again, we cannot say that these findings are clearly erroneous, especially in light of the absence of evidence connecting Burgos's punishment to his prior disclosure of overbilling by outside counsel—Burgos's only action that could reasonably be considered protected whistleblowing. Hence, even if we believed that the RTC's disciplining of Burgos constituted a constructive discharge, we could not say it was wrongful.

■ The cases of Pederson and Taylor are slightly different, as they made no submissions to the court explaining their decisions to accept the RTC's severance packages and resign. Nonetheless, we can safely say that they have not sustained the burden imposed by *Bois*. They do not suggest that the RTC's allegedly retaliatory conduct so increased around this time that they were forced out of the agency; rather, their decision to leave at that point appears to have been motivated by the general availability of the new Voluntary Separation Incentive Program. Even assuming that RTC misbehavior was an essential factor in their decision to accept the incentive program (a weight on the scale but for which they would have

declined the attractive opportunity to quit), that behavior had plainly not been enough to sway them before the program was established. An employer does not effect a constructive discharge merely because its creation of a general separation program makes resignation attractive enough to bring about the departure of an employee otherwise inclined to remain. Here, the timing suggests overwhelmingly that but for the general program of sweetened departure terms, Taylor and Pederson would have been content to remain. This analysis is not altered by the short handwritten notes that both plaintiffs added to their form resignation letters summarily contradicting the form letter's statement that the decision to take advantage of the severance program was "entirely voluntary." These notes add nothing substantive to the inadequate evidence that Taylor and Pederson's decisions to leave the RTC were wrongfully coerced.

We therefore hold that Taylor, Pederson, and Burgos's requests for preliminary injunctive relief are moot in their entirety. Dunn's request remains live to the extent that he seeks to enjoin future post-termination retaliation by the RTC along the lines of that alleged in his affidavits. But even his request is moot with respect to the agency's conduct prior to his termination and to the termination itself.

### B. Dunn's Fifth Amendment Claims and Other Injuries

■ We now turn to Dunn's remaining live claims for relief. To be entitled to a preliminary injunction, Dunn must—at a minimum [1]—demonstrate four things: (1)

---

1. The RTC argues that because plaintiffs are challenging federal personnel decisions, they must additionally show that the irreparable harm claimed outweighs the "disruptive effect which the grant of [preliminary relief is] likely to have on the administrative process" and the government's "wide [] latitude in the dispatch of its own internal affairs." *Sampson v. Murray*, 415 U.S. 61, 83, 94 S.Ct. 937, 949, 39 L.Ed.2d 166 (1974) (citation and quotation marks omitted). But *Sampson* involved a plaintiff's attempt to short-circuit an administrative scheme explicitly designed to resolve the exact type of personnel dispute at issue. Our circuit has not resolved the applicability of this heightened standard to suits *not* implicating such an administrative scheme.

See *Wagner*, 836 F.2d at 575 n. 66. We need not decide the matter here, either, given that we find that Dunn has failed to meet even the ordinary standards for a preliminary injunction. We note that the issue may be in large part mooted by post-*Sampson* decisions finding that the Civil Service Reform Act deprives the federal courts of jurisdiction over claims for which those statutes provide a remedy, see *United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988); *Spagnola v. Mathis*, 859 F.2d 223, 230 n. 13 (D.C.Cir.1988), and in other cases often requires deferral of such action until the plaintiff has exhausted administrative remedies, see *Steadman v. U.S. Soldiers' & Airmen's Home*, 918

that he is substantially likely to succeed on the merits of his suit, (2) that in the absence of an injunction, he would suffer irreparable harm for which there is no adequate legal remedy, (3) that the injunction would not substantially harm other parties, and (4) that the injunction would not significantly harm the public interest. See, e.g., *Wagner v. Taylor*, 836 F.2d 566, 575 (D.C.Cir.1987); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958). We review a district court's balancing of these factors for abuse of discretion. *City of Las Vegas*, 891 F.2d at 931.

■ Dunn asserts that the RTC has interfered with his employment prospects since he left the agency and thus deprived him of a liberty interest protected by the Fifth Amendment without due process; he further argues that this infringement of his constitutional rights is irreparable injury sufficient to support preliminary relief. But while Dunn has made allegations of seriously defamatory conduct on the part of the RTC—allegations that have to this point largely gone unrebutted—we agree with the district court that he has not demonstrated government action rising to the level of a constitutional deprivation.

■ Constitutional injury supposes something more than simple defamation or stigma. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Even a plaintiff who receives an admittedly defamatory recommendation from a prior government employer that "would undoubtedly ... impair his future employment prospects" cannot establish a constitutional violation "so long as such damage flows from injury caused by the defendant to a plaintiff's reputation" alone. *Siegert v. Gilley*, 500 U.S. 226, 234, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991). To prove constitutional injury, the plaintiff must show not only that the government has imposed some stigma upon him, but also that it has worked some change in his status under law. See *Paul v. Davis*, 424 U.S. at 711–12, 96 S.Ct. at 1165–66.

Our circuit recently described two ways that a litigant alleging government interfer-

ence with his future employment prospects may demonstrate the tangible change in status required to prove constitutional injury. In *Kartseva v. Department of State*, 37 F.3d 1524 (D.C.Cir.1994), we held that "if [the government's] action formally or automatically excludes [the plaintiff] from work on some category of future [government] contracts or from other government employment opportunities, that action ... implicates a liberty interest." *Id.* at 1528. Alternatively, the plaintiff may demonstrate that the government's action precludes him—whether formally or informally—from such a broad range of opportunities that it "interferes with [his] constitutionally protected 'right to follow a chosen trade or profession.'" *Id.* at 1529 (quoting *Cafeteria and Restaurant Workers v. McElroy*, 367 U.S. 886, 895–96, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961)). In other words, government action precluding a litigant from future employment opportunities will infringe upon his constitutionally protected liberty interests only when that preclusion is either sufficiently formal or sufficiently broad.

The district court found—without clear error— that neither was the case for Dunn. The court credited the RTC's assertion that the agency had taken no action to formally debar Dunn or automatically disqualify him from working on any future RTC contracts, and Dunn presents no convincing evidence to the contrary. The Coopers letter, recording that "sources within the RTC" had told the firm it was "specifically prohibited from using Mr. Dunn on any RTC related work," is too second-hand and vague to seriously undermine the sworn statement of the Contractor Ethics Program Manager, credited by the district court, denying any formal debarment.

Nor has Dunn demonstrated that the agency took informal action against him so broad that it infringed upon his "right to follow a chosen trade or profession." The standard Dunn must meet in this regard—showing that the government "has seriously affected, if not destroyed, his ability to obtain employment in [his] field," *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959)—is high: the RTC's

F.2d 963 (D.C.Cir.1990); *Suzal v. U.S. Informa-* *tion Agency*, 32 F.3d 574 (D.C.Cir.1994).

misconduct must substantially reduce the value of his human capital, as it would if his skills were highly specialized and rendered largely unmarketable as a result of the agency's acts. Compare *Greene*, 360 U.S. at 492, 79 S.Ct. at 1411 (exclusion of aerospace engineer from work in all government-sponsored aeronautics facilities infringes constitutional liberty interest), with *Cafeteria and Restaurant Workers v. McElroy*, 367 U.S. at 895–96, 81 S.Ct. at 1748–49 (revocation of short-order cook's permission to work on military base does not implicate liberty interest because she "remained entirely free to obtain employment as a short-order cook or to get any other job," even with same employer at a different facility). Yet all Dunn proffered in this regard was a simple assertion that he has been unable to find employment in his chosen field, a difficulty that if true might easily be explained in other ways in light of his record at the RTC. The district court therefore did not clearly err in finding that the Coopers & Lybrand incident was only an isolated, "one-time occurrence." Dunn has failed to carry his burden of persuasion.

Given the inadequacy of Dunn's prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief. We note, however, that should Dunn ultimately prevail, his economic losses would be recoverable under 12 U.S.C. § 1441a(q)(3), which provides for compensatory damages; and in the absence of special circumstances, which Dunn does not assert, recoverable economic losses are not considered irreparable. See *Sampson*, 415 U.S. at 90, 94 S.Ct. at 952–53 ("temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury"); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985). Accordingly, we find no abuse of discretion in the district court's denial of Dunn's request for a preliminary injunction.

### C. *GAP's Standing and Continuing Injury*

■ Before addressing GAP's request for injunctive relief on the merits, we must first resolve a jurisdictional issue: whether the organization has standing to pursue its claims in federal court at all. *Humane Soc'y*

*v. Babbitt*, 46 F.3d 93, 96 (D.C.Cir.1995). GAP offers two theories. It argues that the RTC's alleged violations of the RTC Whistleblower Act interfere with the organization's "ability to gather and disseminate information about the RTC" and frustrate its "concrete, programmatic activities." In addition, it maintains that the agency's interception of and interference with confidential communications from sources within the RTC violates its First Amendment right to receive the communications of willing speakers. We hold that GAP lacks standing entirely under the RTC Whistleblower Act; furthermore, while we hold that GAP has standing to *bring suit* under the First Amendment, we find that it has not sufficiently alleged a continuing injury that would justify granting its motion for *preliminary relief*.

■ A litigant challenging government action under a federal statute must satisfy not only the constitutional requirements of standing but also its prudential prerequisites; the litigant must show that it falls within the statute's "zone of interests" by demonstrating "either a congressional intent to protect or regulate the interest asserted, or some other indication that the litigant is a suitable party to pursue that interest in court." *Animal Legal Defense Fund v. Espy*, 23 F.3d 496, 502 (D.C.Cir.1994). GAP's doubtless sincere interest in promoting the underlying purposes of the RTC Whistleblower Act is not enough to support standing to sue under that statute; otherwise, any party that bothered to sue would *ipso facto* locate itself within the relevant zone of interests. See *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 813 (D.C.Cir.1987). In identifying the Act's intended zone of interests, we look to the means selected by Congress to fulfill its purposes. *Animal Legal Defense Fund*, 23 F.3d at 503. And Congress has focused solely on the actual employees of the RTC and of its contractors: only to them does the Act afford explicit protection and remedies. 12 U.S.C. § 1441a(q)(1). Furthermore, GAP cannot even claim to be an intended *recipient* of protected disclosures under the Act, which protects disclosures only to a small number of named entities—"the [Resolution Trust] Corporation, the Thrift Depositor Oversight Board, the Attorney General, or any appro-

priate Federal banking agency." *Id.* Given Congress's explicit designation of a class of direct beneficiaries and its clear statement of remedies, which are seemingly adequate to elicit vigorous, aggressive enforcement, we can see no ground for inferring any intent to designate other potential recipients, unnamed by the Act and different in character from the named recipients, as supplemental challengers of possibly illegal activity.

■ On the other hand, we agree with GAP that it has a First Amendment interest in receiving information from willing speakers within the RTC sufficient to support its standing to bring a constitutional challenge. "[W]here a speaker exists ... the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both." *Virginia Pharmacy Bd. v. Virginia Consumer Council,* 425 U.S. 748, 756, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) (collecting cases and holding, on that principle, that consumers of prescription drugs had standing to challenge state law forbidding advertising of prescription drug prices). GAP has met the requirement of pleading the existence of specific willing speakers. See *Gregg v. Barrett,* 771 F.2d 539, 547–48 (D.C.Cir.1985). Indeed, four of these speakers are the individual plaintiffs whose claims we have already discussed; furthermore, GAP has alleged specific ways, direct and indirect, by which the RTC has intercepted and interfered with the organization's communications with these speakers. Thus GAP has adequately pled facts supporting its standing to bring suit on First Amendment grounds.

■ But to establish the grounds for a preliminary injunction GAP must show more: it must demonstrate a substantial probability of success on the merits and an irreparable injury that the proposed injunction would avert. This inquiry overlaps with the standing issue somewhat; without adequate proof of a threatened injury, plaintiff lacks both standing and an adequate basis in equity for an injunction. *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Fair Employment Council v. BMC Marketing Corp.,* 28 F.3d 1268, 1272–74 (D.C.Cir.1994). Here the district court found

that "none of the plaintiffs named in this action has been so chilled as to keep his or her story from GAP" and that GAP failed to show that "other RTC employees have been 'chilled' from providing GAP with information." These findings are not clearly erroneous. Not only does it appear that the four individual plaintiffs have overcome any reluctance to speak that might have been caused by the RTC's behavior, but none—for the reasons stated before—is any longer potentially subject to direct retaliation, harassment or surveillance as an employee. Only Dunn has alleged potentially chilling conduct by the RTC following his termination, but as noted above, the only alleged post-employment retaliation that the district court credited was the single, discrete Coopers & Lybrand episode, which is inadequate to chill Dunn's future communications to GAP.

The remaining evidence properly before the court was extremely limited. Following their initial submission of a 63–page motion for relief with hundreds of pages of exhibits, and shortly before the government's response was originally due, the plaintiffs tried to submit an additional nine affidavits from alleged victims of RTC retaliation who were not parties to the suit. The court rejected these last minute affidavits, explaining in its final memorandum that it had done so "because defendants lacked an adequate opportunity to respond to those extra-complaint allegations before the hearing on the preliminary injunction motion." Given the district court's repeated attempts to focus the litigation and keep the filings at a manageable level, and in light of District Court Rule 205's exhortation that the original application for a preliminary injunction contain "*all* affidavits on which the plaintiff intends to rely" (emphasis added), this was not an abuse of discretion. The only relevant evidence properly filed consists of two statements in an affidavit from a GAP official. The first asserts that two RTC employees came forward and provided GAP with "substantial information" about agency misconduct but declined to become plaintiffs in the suit out of fear of retaliation. This hardly helps GAP. It suggests that despite the agency's actions, RTC employees remained willing to supply the

organization with information, even if they drew the line at joining GAP's suit; GAP has not asserted (nor can we imagine) a First Amendment right to enjoin government conduct that inhibits other persons who might be potential plaintiffs from filing lawsuits. The other statement in the affidavit says that "Whistleblower [sic] who possess information crucial to [GAP's media campaign] are unwilling to disclose the information due to a well justified fear of reprisal by the RTC." This is entirely conclusory. Neither statement makes the district court's finding that GAP suffers no First Amendment injury clearly erroneous or casts doubt on its conclusion that preliminary relief was unwarranted.

\* \* \*

The district court's denial of injunctive to all plaintiffs is therefore

*Affirmed.*