Cuthbert O. **SIMPKINS, M.D., Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health & Human Services, et al., Defendants.**

No. Civ.A.95–1095 (RCL).

United States District Court, District of Columbia.

March 31, 1998.

Coburn & Schertler, Washington, DC, for plaintiff.

Daniel F. Van Horn, Assistant United States Attorney, Washington, DC, Sandra Pressman, Office of the General Counsel, U.S. Department of Health & Human Services, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on the defendants' motion to dismiss or, in the alternative, for summary judgment, and the plaintiff's cross-motion for summary judgment.

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). This case is proper for summary judgment as it does not present any disputed issues of material fact. For the reasons set forth below the court grants the plaintiff's motion for summary judgment in part and denies it in part. The defendants' motion to

dismiss or, in the alternative, for summary judgment is likewise granted in part and denied in part.

## I. Background

Plaintiff Cuthbert O. Simpkins, M.D., is a former medical officer at the District of Columbia General Hospital ("D.C.General"). This suit arises out of a series of events occurring during plaintiff's employment at D.C. General and the hospital's subsequent report of these events to federal authorities.

### 1. The Prior Related Lawsuit and Procedural Posture of this Case

Before addressing the specific issues before the court and the factual circumstances out of which they arise, it may be useful to review the procedural posture of this case and the prior suits involving these and other associated parties.

On or about August 24, 1992, plaintiff filed a civil action in the Superior Court for the District of Columbia against the District of Columbia, four D.C. General officials, the National Practitioner Data Bank ("Data Bank"), and Louis W. Sullivan, M.D., who had been the Secretary of the United States Department of Health and Human Services ("HHS") at the time of the report. Plaintiff alleged breach of contract, deprivation of procedural and substantive due process, libel and slander, intentional infliction of emotional distress, constructive discharge, civil conspiracy, and violations of federal law in connection with D.C. General's report to the Data Bank. The federal defendants subsequently removed the case to this court and the United States substituted itself for the Secretary of HHS on the common law tort claims. The Secretary remained a defendant to the extent the complaint asserted constitutional tort claims against the Secretary.[1] This court granted the joint motion of the United States and the Secretary of HHS to dismiss under FED.R.CIV.P. 12(B)(6), dismissing all the claims against these defendants with prejudice. *Simpkins v. District of Columbia Government* ("Simpkins I"), Civil Action No. 92–2119(RCL), Memorandum Opinion and Order (D.D.C. July 7, 1994), *aff'd in part rev'd in part,* 108 F.3d 366 (D.C.Cir. 1997). This court dismissed the claims against the Data Bank without prejudice for failure to prosecute. *Id.* In light of the dismissal of the federal parties, this court also declined to exercise supplemental jurisdiction over the rest of the case and so those claims were dismissed without prejudice. *Id.*

While an appeal of *Simpkins I* was pending, plaintiff filed the present action against the Secretary of HHS and HHS, later amending his complaint to add the Data Bank as a defendant. In this case, plaintiff alleges several violations of law, asserting that these violations should result in removal of D.C. General's Adverse Action Report from the Data Bank, either by order of this Court or, in the alternative, upon remand to the administrative agency administering the Data Bank, HHS. On October 5, 1995, defendants filed a renewed motion to dismiss or, in the alternative, for summary judgment, contending that plaintiff's claims were barred by res judicata and that the plaintiff's claims lacked substantive merit. The decision of the United States Court of Appeals for the District of Columbia Circuit ("D.C.Circuit") in *Simpkins v. District of Columbia Government* ("Simpkins II"), 108 F.3d 366 (D.C.Cir. 1997), holding that certain claims against the federal defendants should have been dismissed without prejudice instead of with prejudice, eliminated the grounds for defendants' res judicata argument, *see id.* at 370–371, and defendants therefore withdrew this argument. Nevertheless, defendants continue to maintain that plaintiff's arguments lack substantive merit.

### 2. The Facts

During 1990–1991 questions arose concerning plaintiff's conduct in approximately three to four cases at D.C. General. At that time, Dr. Bernard Anderson, the Chairman of the Department of Surgery at D.C. General directed Dr. Jean–Jacques, the Section chief and Dr. Simpkins' immediate supervisor, to

---

1. The Federal Tort Claims Act does not apply to a civil action against a government employee "which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

review Dr. Simpkins' level of care to determine whether an adjustment in Dr. Simpkins' clinical privileges was warranted. By memorandum dated May 30, 1991, Dr. Jean–Jacques recommended (1) monitoring plaintiff's cases for six months, (2) encouraging plaintiff to consult with Dr. Anderson and Dr. Jean–Jacques as plaintiff deemed necessary, and (3) further recommendations at the end of six months. These recommendations were to be effective on June 17, 1991, subject to the agreement of Dr. Anderson, Dr. Simpkins, and all other interested parties. Plaintiff's resignation, effective June 17, 1991, rendered any further action with respect to these recommendations moot.

On October 4, 1991, D.C. General submitted an Adverse Action Report concerning plaintiff Simpkins to the Data Bank, which is administered by HHS pursuant to the Health Care Quality Improvement Act of 1986 ("HCQI Act"), 42 U.S.C. § 11101 *et seq.* The Data Bank was established by Congress to address the problems that can result when doctors who are identified by their peers as being incompetent or unprofessional are able to move and continue their medial careers without anyone being aware of their previous incompetence or unprofessional actions. 42 U.S.C. § 11101(1) & (2).

The Adverse Action Report submitted to the Data Bank by D.C. General indicated that Dr. Simpkins resigned his staff privileges at D.C. General during a review of his quality of care. Plaintiff disputed the accuracy of the report and requested review by the Secretary of HHS. Following that review, the Secretary determined that the report was accurate. Plaintiff was permitted at that time to submit a statement indicating his dispute with the Adverse Action Report, and plaintiff did so.

3. The Issues

Plaintiff's amended complaint contains five counts. Plaintiff charges that defendants have violated the Administrative Procedure Act (Count One), the HCQI Act (Count Two), and the Fifth Amendment to the United States Constitution (Count Three). Plaintiff also contends that defendants have libeled him (Count Four) and tortiously interfered with plaintiff's contractual, economic, and business relations (Count Five). All of plaintiff's charges arise from HHS' decision to include the D.C. General Adverse Action Report concerning plaintiff Simpkins in the Data Bank.

II. Discussion

A. The Administrative Procedure Act

The Court shall first consider plaintiff's allegations under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501 *et seq.* Plaintiff argues that the defendants' actions with regard to the Adverse Action Report were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). Plaintiff claims that HHS's review of the Adverse Action Report was improper, and that a more thorough examination by HHS would have revealed that neither of the predicate conditions for a Data Bank report, as established by Section 11133 of the HCQI Act, were present. Defendants respond that judicial review of HHS's actions under the APA is highly deferential and that HHS's obligations under the HCQI Act are narrow and limited.

Defendants correctly point out that judicial review of administrative action under the APA is limited to the administrative record before the agency at the time the agency issues its decision. *See Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Defendants assert that under the APA the "standard of review is a highly deferential one, which presumes the agency's action to be valid." *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981) (citations omitted). Nevertheless, the D.C. Circuit in *Costle* also asserted:

[W]e must be assured that the agency action was "based on a consideration of the relevant factors," and that "the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." Our inquiry into the facts must also be searching and careful.

657 F.2d at 283 (citations omitted). Hence, it is this Court's task to determine whether HHS exercised reasoned decision making,

whether it considered the relevant factors, and whether the facts have some basis in the record. *National Treasury Employees Union v. Horner,* 854 F.2d 490, 498 (D.C.Cir. 1988).

Applying these principles of law to the present dispute, this court must consider plaintiff's claim that HHS acted arbitrarily and capriciously in concluding that the information contained in D.C. General's Adverse Action Report should be entered into the Data Bank. Defendants firmly adhere to their administrative action, arguing:

> Plaintiff had resigned from his position at the hospital, such action by a physician normally implies a surrender of clinical privileges, and plaintiff presented no evidence to indicate that he was still willing to practice medicine at D.C. General despite the hospital's report to the contrary. In addition, the documentation submitted to HHS by plaintiff, taken as a whole, indicated that an investigation concerning plaintiff's professional competence was being conducted by D.C. General at the time plaintiff resigned, and was discontinued only because of plaintiff's resignation.

Defendants Consolidated Reply Memorandum and Opposition To Plaintiff's Cross–Motion For Summary Judgment ("Def.Mem.") at 8.

Section 11133 of the HCQI Act requires a report to the Board of Medical Examiners by "[e]ach health care entity which . . . (B) accepts the surrender of clinical privileges of a physician (i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or (ii) in return for not conducting such an investigation or proceeding. . . ." 42 U.S.C. § 11133(a)(1). The Board of Medical Examiners is required to submit this information to the Secretary or in the Secretary's discretion, to an appropriate private or public agency. *See* 42 U.S.C. § 11134.

■ Defendants appear to argue that they did not need to review the accuracy of the information submitted to the Data Bank. The defendants phrase this argument as support for the contention that plaintiff was given meaningful notice or opportunity to contest his listing in the Data Bank. Nevertheless, this court disagrees with the implication of defendants' argument, namely that the Secretary could resolve all concerns about a Data Bank report by simply "noting that a dispute exists about the accuracy of the information and including a brief statement by the physician or practitioner setting forth the disagreement regarding the information." Def. Mem. at 9 (citing H.R. Rept. No. 903, 99th Cong., 2nd Sess., at 19, reprinted in 1986 U.S.Code Cong. & Admin News at 6402). As defendants recognize, the HCQI Act requires HHS to establish procedures to govern disputes concerning the accuracy of information contained in the Data Bank. 42 U.S.C. § 11136(2). Pursuant to this requirement, HHS issued 45 C.F.R. § 60.14, which describes how to dispute the accuracy of Data Bank information. These regulations provide that if the reporting entity does not revise the reported information, the Secretary will, upon request, review the written information submitted by both parties, and if the Secretary concludes that the information was incorrect, send corrected information to previous inquirers. *See* 45 C.F.R. § 60.14. This indicates that in certain circumstances the Secretary's duties under the HCQI Act are broader than the defendants imply.·

Moreover, this court is convinced that regardless of what HHS's obligations may or may not be to review whether a reporting entity acted correctly in a peer review action or an entity's investigation of a doctor, it has a duty to determine whether the events that transpired should have resulted in a Data Bank Report. Imagine a situation in which an entity suspends a doctor's clinical privileges and then files a subsequent report. Surely there is a difference between requiring HHS to review whether the health care entity acted correctly in suspending the doctor and requiring HHS to review whether the entity in fact suspended the doctor. In this case, HHS had a duty to review whether Dr. Simpkins' resignation and D.C. General's actions with regard to Dr. Simpkins triggered D.C. General's reporting responsibilities under the HCQI Act.

Since the present dispute centers on whether the events transpiring as a result of Dr. Simpkins' work at D.C. General consti-

tute reportable acts, this court has no need to determine HHS's responsibilities to review questions such as the validity of a health care entity's decision to suspend a physician's privileges. It suffices to decide that HHS had a duty to determine whether a Data Bank report concerning plaintiff Simpkins should have been submitted.

### 1. Did Plaintiff Surrender his Clinical Privileges Within The Meaning of 42 U.S.C. 11133(1)(b)?

Turning to plaintiff's contentions under the APA, Dr. Simpkins first asserts that HHS incorrectly determined that his voluntary resignation from staff membership constituted the "surrender of clinical privileges of a physician" within the meaning of 42 U.S.C. 11133(1)(b). The defendant replies that there is no meaningful distinction between the resignation of plaintiff's employment and the surrender of his clinical privileges, arguing that in this case, the plaintiff's clinical privileges were co-extensive with his employment.

An initial matter requiring resolution is whether this issue was presented to the agency for review. Although the defendant does not directly discuss this issue in its submissions to the court,[2] the Declaration of Mr. Croft indicates that Dr. Simpkins did not dispute the status of his clinical privileges following his resignation from the hospital and that therefore HHS did not have an opportunity to review these allegations prior to the filing of Dr. Simpkins' current action. Croft Dec. at ¶ 22. Due to the limited nature of judicial review of administrative action under the APA, plaintiff was required to present this issue to HHS at the time it issued its decision. *See Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

After considering the record before the agency at the time it issued its decision, the court is convinced that plaintiff presented this contention to HHS for review. In her September 3, 1991 letter to D.C. General, plaintiff's prior counsel argued that "Dr.

Simpkins' voluntary resignation from staff membership did not constitute a 'surrender of clinical privileges of a physician'" under the HCQI Act. McDonald Letter, Plaintiff's Exhibit 19. In Mr. Croft's August 28, 1997 Deposition, he concedes that this letter was included as Exhibit 5 to Dr. Simpkins' April 6, 1994 letter to the Secretary. Croft Dep. at 13–15. As a result, this court is convinced that the issue was presented for review.

Next, this court must consider whether HHS acted arbitrarily and capriciously in deciding this issue. Plaintiff argues that despite his resignation of employment at D.C. General, he continued to have clinical privileges at D.C. General by virtue of his faculty position at Howard University. Plaintiff argues that although he resigned his employment at D.C. General, he never surrendered his clinical privileges at the hospital. Plaintiff also contends that the lack of proper notation in plaintiff's D.C. General credentialling file indicates that he did not surrender his clinical privileges. Although plaintiff persuasively argues that D.C. General did not eliminate or revoke his clinical privileges, plaintiff has not adequately shown that his resignation did not result in the surrender of his clinical privileges within the meaning of 42 U.S.C. § 11133. After reviewing the evidence before HHS at the time of its decision, this court concludes that HHS' decision that plaintiff resigned his clinical privileges was not arbitrary and capricious.

Plaintiff's contemporaneous conversations with Dr. Lawrence Johnson, who at the time of plaintiff's resignation was D.C. General's Medical Director, provides support for HHS' determination. In these conversations plaintiff clearly expressed a desire to completely disassociate himself from the hospital. Johnson Dep. at 20–22. Moreover, it is undisputed that plaintiff never practiced nor sought to practice medicine at D.C. General at any time subsequent to his resignation. Most significantly, plaintiff stated in his handwritten resignation letter that he was resigning and "leaving the hospital." Pla.Exh. 12. Also, plaintiff's prior attorney, Karen Mc-

---

**2.** The defendants' submissions to the court generally discuss plaintiff's grounds for disputing the accuracy of the Adverse Action Report before

HHS but do not claim that this issue was not presented to the agency for review.

Donald, requested in a July 2, 1991 letter to Donna Wilson of D.C. General that the Chairman of the Department of Surgery or the Director of the hospital acknowledge "Dr. Simpkins' departure from the hospital." Pla. Exh. 14. In light of this evidence, this court finds that HHS' decision that plaintiff resigned his clinical privileges does not rise to the level of arbitrary and capricious conduct.

### 2. Did Plaintiff Resign From D.C. General While Under Investigation?

██ Plaintiff Simpkins also argues that even if he did surrender his clinical privileges within the meaning of Section 11133 of the HCQI Act, he did not do so while D.C. General was reviewing his quality of care, and thus HHS's decision to not remove plaintiff's Data Bank report is arbitrary and capricious.

It is clear from the record in this case that the issue of whether Dr. Simpkins was under investigation at the time he resigned from the hospital was presented to the agency for review. Dr. Simpkins submitted letters to HHS disputing this element of the Data Bank report and HHS dealt with this issue in considering the disputed Adverse Action Report by D.C. General. See Croft Dec. at 4. In Mr. Croft's August 31, 1994 letter to plaintiff Simpkins, he indicated that HHS saw "no evidence to indicate that the hospital was not following its procedures" in investigating plaintiff. Plaintiff's Exh. 25.

The essence of plaintiff's argument is that the review by Dr. Jean–Jacques of plaintiff's performance at the hospital did not qualify as an investigation by the relevant entity, D.C. General, within the meaning of the HCQI Act. Plaintiff stresses that the procedures established by D.C. General's by-laws regarding "Complaints" were not followed in this instance. As a result, plaintiff argues, the entity did not act and D.C. General's reporting procedures under the HCQI Act were not triggered. Plaintiff also argues that Dr. Jean–Jacques' review of Dr. Simpkins' professional competence was completed by the time plaintiff resigned. Defendants reply that Dr. Anderson and Dr. Jean–Jacques were acting within the scope of their responsibilities at the hospital and hence

"their actions with respect to plaintiff were tantamount to action by the hospital." Def. Mem. at 14. Defendants argue that plaintiff's professional competence was still under active consideration by hospital officials when he resigned, and therefore D.C. General was still investigating plaintiff when he resigned.

After considering the relevant law and the particular facts of this dispute, this court finds that the Secretary of HHS acted arbitrarily and capriciously in concluding that D.C. General was investigating Dr. Simpkins at the time he resigned from D.C. General. Since neither of the predicate conditions for a Data Bank Report under 42 U.S.C. § 11133(a)(1)(B) have been established, this incorrect and arbitrary determination by HHS resulted in HHS' arbitrary and capricious decision to include the Adverse Action Report concerning plaintiff Simpkins in the Data Bank.

Section 11133 of the HCQI Act requires a report to the Board of Medical Examiners by "[e]ach health care entity which ... (B) accepts the surrender of clinical privileges of a physician (i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or (ii) in return for not conducting such an investigation or proceeding...." 42 U.S.C. § 11133(a)(1). Neither party contends that there was ever an agreement by Dr. Simpkins to resign in return for D.C. General not conducting an investigation of plaintiff. Hence, HHS' decision relies on a determination that the relevant entity, D.C. General, was investigating plaintiff at the time of his resignation.

The court finds it unnecessary to decide whether Dr. Jean–Jacques' review of Dr. Simpkins was completed at the time of Dr. Simpkins' resignation. Rather, the court is convinced that Dr. Jean–Jacques' review did not qualify as a matter of law as an investigation by a health care entity under the HCQI Act. The relevant statutory authority, case-law, HHS's own Guidebook, and the Bylaws, Rules, and Regulations of the Medical and Dental Staff of D.C. General ("Bylaws") support this view.

Section 11151(4)(A) of the HCQI Act defines the term "health care entity" as:

(i) a hospital that is licensed to provide health care services by the State in which it is located.

(ii) an entity (including a health maintenance organization or group medical practice) that follows a formal peer review process for the purpose of furthering quality health care (as determined under regulations of the Secretary), and

(iii) subject to paragraph (B), a professional society (or committee thereof) of physicians or other licensed health care practitioners that follows a formal peer review process for the purpose of furthering quality review (as determined under regulations of the Secretary).

42 U.S.C. § 11151(4)(A).[3] This definition, in the HCQI Act itself, indicates that an investigation by individual supervisors of a physician's quality of care does not trigger the reporting provisions of 42 U.S.C. § 11133(1)(A) unless the actions of those supervisors amount to action by the hospital. HHS has promulgated its interpretation of "health care entity" at 45 C.F.R. § 60.3. These regulations are substantially similar to the text of the statute.[4] Thus, the text of the relevant statute and regulation signify that formal action by the hospital, as an organization, triggers Section 11133(1)(A)'s reporting provisions, not individual action.

In *American Dental Ass'n v. Shalala*, 3 F.3d 445 (D.C.Cir.1993), the D.C. Circuit determined the proper meaning of the term "entity" as used in Section 11131 of the HCQI Act. In *American Dental Ass'n*, the D.C. Circuit considered the validity of HHS' regulations implementing the reporting requirements of the HCQI Act in the case of malpractice settlements. *See id.* The

court's inquiry focused on whether an "entity" under the HCQI Act includes individual practitioners. *See id.* at 445–446. The court found that the HCQI Act did "not define an 'entity,' but the term as used in the Act refers uniformly to groups and organizations." *Id.* at 446. The court reasoned, "Whenever the Act discusses individual persons, words such as 'physician,' 'doctor,' 'dental surgeon,' 'individual,' and 'person' are consistently employed. Moreover, the phrase 'person or entity' appears elsewhere in the Act, which would be nonsensical if entity already encompassed person." *Id.* at 446–47 (citing 42 U.S.C. § 11137(c)). This reasoning applies with equal force to the text of 42 U.S.C. § 11133, which likewise does not refer to an investigation by a hospital employee nor a physician's supervisor but instead uses the phrase "investigation by the entity." This text indicates that Section 11133 requires action by the relevant entity, D.C. General, and not action by hospital employees or supervisors unless such actions amount to action by the entity.

HHS's own publication, the National Practitioner Data Bank Guidebook ("Guidebook"), also supports this interpretation of the statute. The Guidebook, in a section titled "Investigations," states that "[a]n investigation must be carried out by the health care entity, not an individual on the staff." Guidebook at E–20. Thus, this court is convinced that in order to sustain the Secretary's decision, D.C. General must have been investigating plaintiff at the time it accepted his surrender of clinical privileges. Since, as defendants assert in their argument, an entity can only act through its representatives, this court must address whether the review actions of Dr. Anderson and Dr. Jean–Jacques constituted an investigation by D.C. General.

---

**3.** Section 11151(4)(B) excludes from the health care entity classification those professional societies found by the FTC to have engaged in anticompetitive practices within the last five years that restricted the practice of licensed health care practitioners. See 42 U.S.C. § 11151(4)(b).

**4.** The relevant portion of Section 60.3 provides:
*Health care entity* means:
(a) A hospital
(b) An entity that provides health care services, and engages in professional review activ-

ity through a formal peer review process for the purpose of furthering quality health care, or a committee of that entity; or
(c) A professional society or a committee or agent thereof, including those at the national, State, or local level, of physicians, dentists, or other health care practitioners that engages in professional review activity through a formal peer review process, for the purpose of furthering quality health care.
45 C.F.R. § 60.3.

Neither the statute nor the regulations promulgated in furtherance of the HCQI Act define an investigation. *See* 42 U.S.C. § 11111 *et seq.*; 45 C.F.R. § 60 *et seq.* Nevertheless, the Guidebook and the By-laws provide strong support for the conclusion that D.C. General never "investigated" plaintiff. The Guidebook requires health care entities that submit an adverse action report based on the surrender of a physician's privileges while under investigation to have contemporaneous evidence of an ongoing investigation at the time of surrender. Guidebook at E–19. The Guidebook specifies that "examples of acceptable evidence may include minutes or excerpts from committee meetings; orders from hospital officials directing an investigation; and notices to practitioners of an investigation." *Id.* at 19–20. None of the evidence before HHS at the time of its decision rises to the level of indicating an actual, ongoing investigation of plaintiff by D.C. General at the time of his resignation. Although Dr. Jean–Jacques wrote a memo providing for a six month monitoring of plaintiff's level of care, this action was subject to the agreement of plaintiff and Dr. Anderson. Thus, this letter cannot be properly characterized as "an order directing an investigation" of plaintiff's care. Moreover, Dr. Jean–Jacques stated in his deposition that this review was no greater than any normal review of a physician's care and gave the impression that these recommendations were primarily for plaintiff's benefit and increased comfort. This specifically contradicts the Guidebook's directive that an investigation does not include a routine or general review of cases. Guidebook at E–20.

Other sections of the Guidebook also support this conclusion. The Guidebook contains a section that discusses specific examples of disputed Data Bank reports and describes the appropriate response from the Secretary. *See* Guidebook at F–9. In one situation a practitioner disputes a report that he resigned his privileges during an investigation concerning professional competence. *Id.* One basis of the practitioner's dispute is that no investigation was ongoing at the time he resigned his privileges. *Id.* The Guidebook explains that the Secretary should void the report if the entity is unable to provide contemporaneous "documentation that an investigation was occurring at the time the practitioner left." *Id.*

The Guidebook, in discussing what should constitute a reportable action under the provisions governing professional review actions, states:

> Whether particular actions are reportable to the Data Bank is often best determined by examining a hospital's medical staff by-laws, rules and regulations with regard to provisions defining who is empowered to take a professional review action, what constitutes a professional review action that adversely affects the clinical privileges of a practitioner, and how that action relates to professional competence or professional conduct.

Guidebook at E–21. While this court recognizes the context in which this text appears in the Guidebook, the court is convinced that the Bylaws are an important indicator of whether D.C. General was conducting an investigation of plaintiff at the time of his resignation. These Bylaws conclusively reveal that D.C. General was not conducting an investigation of plaintiff when he left the hospital.

The Bylaws prescribe a detailed "complaint procedure" for investigating alleged physician incompetency or misconduct. Article V of the Bylaws, titled "Complaints Procedure" provides:

B. Complaint Procedure

1. Any complaints against a member of the staff as to his/her overall professional competence may be submitted only by another staff member, must be in writing and must be signed by the complaining staff member.

2. Any complaint described must be submitted to the Medical Director.

3. Upon receipt of the complaint the Medical Director shall:

a. Personally deliver a copy of the complaint to the accused staff member within two (2) working days.

b. Appoint within seventy-two (72) hours an investigating committee com-

posed of three (3) staff members selected as follows:

(1) The accused shall select one member;

(2) the complainant shall select one member, and;

(3) the Medical Director shall select one member.

c. Within two (2) weeks of appointment the investigating committee shall submit its final report and recommendation to the Medical Director.

d. If the accused is found to be competent or no adverse action is recommended, all records of the investigating committee and the complaint shall be destroyed. Reference to the accusation and investigation shall not be put into any official record or unofficial file of the staff member.

e. If the accused is found incompetent, the investigating committee must make recommendations as to action to be taken by the staff. A copy of the final report must be given to the accused at the time it is submitted to the Medical Director.

Bylaws at 20–21. The "review" of Dr. Simpkins did not follow this D.C. General procedure. D.C. General provided no documentation to HHS that a complaint of any kind was ever submitted to the Medical Director of D.C. General. As a result, the specified investigatory procedures mandated by D.C. General's Bylaws were never initiated. No complaint was delivered to the accused staff member, Dr. Simpkins, nor was "an investigating committee" appointed as required by the Bylaws. These deviations from the Bylaws were not minor but rather fundamental in nature and indicate that these actions cannot be reasonably found to constitute an investigation by D.C. General.

The Secretary's failure to follow these authorities or from all appearances even consider these provisions, renders the Secretary's action arbitrary and capricious. In light of these facts, this court cannot sustain the Secretary's decision. It does not amount to an exercise of reasoned decision making. Guided by the deference to which HHS's decision is entitled, this court nevertheless is convinced that the Adverse Action Report concerning plaintiff should be removed from

the Data Bank due to the arbitrary and capricious action of defendants.

**B. The HCQI Act Claim**

█ Plaintiff also claims that a private right of action should be implied under the HCQI Act. Defendant replies that no such right has been recognized by any court that has considered the issue and that a review of the appropriate concerns indicates that there is no private right of action under the HCQI Act. Plaintiff recognizes that a number of courts have ruled that no private right of action exists, but urges this court to decide otherwise since the D.C. Circuit has never considered the issue.

█ The determination of whether a private right of action may be implied from a statute is governed by the factors set forth by the United States Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Those factors include:

(1) whether the plaintiff is a member of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, to create or deny a remedy; (3) whether it would be consistent with the underlying purposes of the legislative scheme to imply a remedy; and (4) whether the cause of action is one traditionally relegated to state law in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law.

*Hancock v. Blue Cross–Blue Shield,* 21 F.3d 373, 374 (10th Cir.1994) (quoting *Goldsmith v. Harding Hospital, Inc.,* 762 F.Supp. 187 (S.D.Oh.1991) (citing *Cort v. Ash,* 422 U.S. at 78)). A review of these factors and the well reasoned decisions of other courts that have considered this issue demonstrates that no private cause of action should be implied under the HCQI Act.

This court finds that plaintiff Simpkins is not in a class of persons for whose especial benefit the HCQI Act was enacted. The HCQI Act was intended to permit more effective professional review actions and thereby benefit patients. *See* 42 U.S.C. § 11101 *et seq.; Id.* at 373; *Doe v. HHS,* 871 F.Supp.

808, 812 (E.D.Pa.1994); *Goldsmith*, 762 F.Supp. at 188–90; *Caine v. Hardy*, 715 F.Supp. 166, 170 (S.D.Miss.1989), *rev'd on other grounds*, 905 F.2d 858 (5th Cir.), *superseded by* 943 F.2d 1406 (5th Cir.1991) (en banc) (affirming the district court), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). For example, the Data Bank provisions were enacted to address the problems that can result when doctors who are identified by their peers as being incompetent or unprofessional are able to move and continue their medical careers without anyone being aware of their previous incompetence or unprofessional actions. *See* 42 U.S.C. § 11101(1) & (2). This purpose hardly implies an overarching desire by Congress to protect physicians. Whatever protections the law may preserve for individuals such as plaintiff, this court concludes that this statute was not intended to specifically protect individuals such as plaintiff.

This court also finds no legislative intent to create a separate cause of action for physicians, even those wronged as a result of an action taken pursuant to the HCQI Act. Although Congress placed provisions in the HCQI Act to protect physicians against unjust or improper action, it did not intend to create new causes of action to enforce these protections. Moreover, an express goal of the HCQI Act was to promote awareness of potentially incompetent or unprofessional physicians. *See id.;* H.R.Rep. 903, 99th Cong., 2d Sess., at 3, reprinted in 1986 U.S.Code Cong. & Admin. News at 6384–85. *See also Imperial v. Suburban Hospital Assoc., Inc.*, 37 F.3d 1026, 1028 (4th Cir.1994); *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318, 1321–23 (11th Cir. 1994), *cert. denied*, 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995). To recognize a cause of action for physicians harmed by review actions would work against congressional intent by undermining the effectiveness of the system created by the HCQI Act. *Goldsmith*, 762 F.Supp. at 189–90; *Doe*, 871 F.Supp. at 812.

Hence, this court's analysis of the HCQI Act under the factors in *Cort v. Ash*, leads to the conclusion that plaintiff's claim must be rejected; no private cause of action should be implied.

Other courts to consider this issue have uniformly held that no private right of action should be implied under the statute. *See Hancock*, 21 F.3d at 374 ("The few courts that have addressed this issue have arrived at the same conclusion.") (citing *Goldsmith*, 762 F.Supp. at 188–90; *Caine v. Hardy*, 715 F.Supp. at 170; *Regualos v. Community Hosp. Assoc.*, 1991 WL 239953 at *4 (W.D.Mich. Aug.7, 1991)). *See also Doe*, 871 F.Supp. at 811–13.

The *Doe* case is particularly instructive because, as in this case, it involved a lawsuit against the congressionally designated messengers, HHS and the Secretary of HHS, rather than against a former employer. *Doe*, 871 F.Supp. at 812. In *Doe*, the court considered whether to grant an injunction that would force HHS to eliminate a physician's adverse action report from the Data Bank. *Id.* at 810–811. The court rejected plaintiff's claim that a private right of action existed under the HCQI Act after thoroughly analyzing each factor of the *Cort v. Ash* test and concluding that none of these factors weighed in favor of an implied cause of action. *Id.* at 812.

Furthermore, this court finds plaintiff's reliance on *American Dental Ass'n v. Shalala*, 3 F.3d .445 (D.C.Cir.1993) misplaced. Contrary to plaintiff's contentions, *American Dental Ass'n* involved a *Chevron* analysis under the APA and provides no support for plaintiff's arguments with regard to either the underlying issues of the *Cort v. Ash* test nor the ultimate decision on an implied right of action. *Id.* at 446–47.

C.   The Due Process Claim

■   Plaintiff contends that he was given no meaningful notice or opportunity to contest his listing in the Data Bank. He alleges that this lack of notice amounts to a "completely inadequate procedural methodology" under the Due Process Clause of the Fifth Amendment. He argues that this lack of notice implicates the Due Process Clause because his inclusion in the Data Bank impinges on his constitutionally protected liberty and property interests.

The Due Process Clause of the Fifth Amendment provides that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. V. To trigger due process protections, this court must find that the challenged action impinged on a constitutionally protected interest—life, liberty, or property. *See Pinar v. Dole,* 747 F.2d 899, 913 (4th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985) (citation omitted); *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1037 (5th Cir.1982) (citing Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

After careful consideration, this court holds that the plaintiff has not demonstrated a protected liberty or property interest in this case that would prevent the granting of summary judgment.[5]

Contrary to plaintiff's assertions, this court does not view the D.C. Circuit's opinion in *Kartseva v. Department of State,* 37 F.3d 1524 (D.C.Cir.1994) as weighing in plaintiff's favor. As an initial matter, the *Kartseva* court faced a motion to dismiss rather than a summary judgment motion. *See id.* at 1525. Moreover, *Kartseva* provides no support for recognizing a liberty or property interest in this case. The *Kartseva* court stated that the plaintiff's liberty interest would be implicated if the challenged action "worked a change in *Kartseva's* status under law, either by (a) automatically excluding her from a definite range of employment opportunities ... [with the federal government] or (b) broadly precluding her from continuing in her chosen career of a Russian translator." *Id.* at 1527. The simple fact is that Dr. Simpkins inclusion in the Data Bank does not satisfy either of these standards. Dr. Simpkins has not been formally prevented from obtaining employment as a doctor with the federal government. Rather, the Data Bank merely provides future employers with information about doctors. Moreover, Dr. Simpkins has been able to find continuing employ-

ment as a doctor, his chosen profession. Pla. Mem. at 3. Thus, *Kartseva* fails to support plaintiff's argument.

Furthermore, other courts to consider the issue have found that a Data Bank listing does not implicate a constitutionally protected liberty or property interest. *See e.g. Randall v. United States,* 30 F.3d 518 (4th Cir.1994), *cert. denied,* 514 U.S. 1107, 115 S.Ct. 1956, 131 L.Ed.2d 849 (1995); *Doe,* 871 F.Supp. at ‚813–14. In *Randall,* an Army doctor contended that an adverse action report entered into the Data Bank denied her the right to practice her profession free from an imposed stigma. *Randall,* 30 F.3d at 522. However, the Fourth Circuit disagreed, holding that the plaintiff was not deprived of her liberty interest. *Id.* The court found that inflicting a stigma on a plaintiff's reputation, via the Data Bank, does not rise to the level of a constitutional deprivation, even if it causes harm to a plaintiff in obtaining future employment. *Id.* (citing *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding that injury to reputation by itself is not a protected liberty interest)).

In *Doe,* the plaintiff contended that HHS violated his due process rights by not affording him proper notice or opportunity to be heard in relation to an adverse action report included in the Data Bank. The plaintiff argued that the Data Bank report impinged on his liberty and property interests by "curtailing his ability to engage in his occupation as an Osteopathic Physician and by damaging his reputation." *Doe,* 871 F.Supp. at 813. Relying on *Siegert* and *Paul,* the court held that the plaintiff had no liberty interest at stake. *Id.* The court reasoned that injury to reputation and difficulties in obtaining future employment as a result of a Data Bank report did not rise to a liberty deprivation. *Id.* at 813–14.

The *Doe* court also found that plaintiff had not shown a deprivation of a constitutionally

---

5. The court agrees with defendants that plaintiff appears to have overlooked the precise procedural posture of the case. Plaintiff's argument appears to assume that he needs to merely allege a

claim; however, as defendants point out, plaintiff must demonstrate at a minimum that there is a genuine issue of fact for trial. *See* Fed R.Civ.P. 56(c) & (e).

protected property interest. The court found that, under the test set forth in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the plaintiff had to establish more than "an abstract need or desire . . . he must instead, have a legitimate claim of entitlement to it." *Id.* at 814 (citing Roth, 408 U.S. at 577). While the court recognized that a physician has a right to practice his profession, the court also recognized the government's interest in protecting the public health, safety, and welfare. *See id.* The court held that the *Doe* plaintiff had no legitimate property interest in having the information in the adverse action report excluded from the Data Bank. *See id.*

Due to this court's finding that no constitutionally protected liberty interest is implicated by the defendants' acts, it is unnecessary to consider whether the protections afforded plaintiff meet the demands of due process.

D. The Common Law Tort Claims

▇ Plaintiff also alleges the common law tort claims of libel and tortious interference with plaintiff's contractual, economic, and business relations. Plaintiff claims that these common law tort actions may be asserted against defendants because they involve injunctive and declaratory relief rather than a claim for damages, which plaintiff concedes would be barred by the Federal Tort Claims Act ("FTCA"). Defendants reply that they are entitled to immunity under the relevant statutes and the decision of the Court of Appeals in *Simpkins II*, 108 F.3d 366, 371 (D.C.Cir.1997).

▇ In 1998, Congress amended the FTCA with passage of the Federal Employees Liability Reform and Tort Compensation Act ("FELRTCA"), which provides that federal employees enjoy absolute immunity for torts committed while acting within the scope of their employment. *See* 28 U.S.C. § 2679. A plaintiff's sole remedy for action taken by employees acting within the scope of their duties is against the government, even if the government would not be liable due to sovereign immunity. *United States v. Smith*, 499 U.S. 160, 166, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). The common law torts alleged by plaintiff arise out of the actions of federal employees performing their official duties. Thus, plaintiff's sole remedy is against the government and his cause of action must be sanctioned by the FTCA or a similar statute waiving sovereign immunity.

Plaintiff's claims against the government fall within an exception in the FTCA to its general waiver of immunity. Absent such a waiver, plaintiff cannot validly assert such a claim. Section 2680(h) states that the provisions of the FTCA shall not apply to *any* claim for libel or interference with contract rights. *See* 28 U.S.C. § 2680(h). These exceptions encompass plaintiff's claims for injunctive and declaratory relief in Counts Four and Five. *See USIA v. Krc*, 989 F.2d 1211, 1216 (D.C.Cir.1993) (finding a claim for intentional interference with employment opportunities as falling within the Section 2680(h) exception); *Art Metal–USA, Inc. v. United States*, 753 F.2d 1151, 1154 (D.C.Cir. 1985) (finding that a damages claim for interference with prospective advantage is barred under Section 2680(h) as a claim arising out of interference with contract rights and that it didn't matter whether these contractual rights were then existing or subject to future creation).

Plaintiff relies on the D.C. Circuit's decision in *USIA v. Krc*, 989 F.2d 1211 (D.C.Cir. 1993) as supporting its common law tort claims. While this court recognizes that in *Krc* the D.C. Circuit was faced with a request for an injunction based upon a common law tort action falling within 28 U.S.C. § 2680(h) and found such a claim proper, this court believes that the reasoning of *Krc* dictates a different result in this case. *See id.* at 1216. In *Krc*, the D.C. Circuit specifically contrasted the situation presented with one in which a statute limits a plaintiff's remedies. *See id.* (interpreting *Sharp v. Weinberger*, 798 F.2d 1521 (D.C.Cir.1986), as finding that the waiver of sovereign immunity in the APA did not extend to actions for specific performance in contract cases because the Tucker Act and the Little Tucker Act impliedly prohibited such relief). The D.C. Circuit found that because the FTCA specifically prohibited money damages and no statute limited Krc's causes of action—explicitly or impliedly, injunctive relief should be impli-

edly available. *See id.* Here, the FELRTCA makes the FTCA an exclusive remedy for these types of claims. *See Simpkins II,* 108 F.3d at 371 (discussing the effect of the FTCA and FELRTCA on a libel action and finding that "both the United States and federal employees acting within the scope of their duties are immune from common law actions for libel and slander") (citing Smith, 499 U.S. at 160). The D.C. Circuit's reasoning in *Krc* dictates that this court find the defendants in the present action immune to plaintiff's claims because the FELRTCA makes the FTCA the exclusive remedy for plaintiff's claims and plaintiff's causes of action fall within the FTCA's exception to the waiver of immunity.

In summary, the court is convinced that the FELRTCA, when read in conjunction with the FTCA and the APA, precludes any governmental liability, and should result in dismissal of Counts Four and Five of plaintiff's complaint for failure to state a claim on which relief may be granted. *See* FED. R.CIV.P. 12(b)(6).

III. Conclusion

For the reasons set forth herein, the court grants the plaintiff's motion for summary judgment as to Count One of his complaint. The court grants the motion of the defendants to dismiss, or in the alternative, for summary judgment as to all other Counts.

A separate order shall issue this date.

### ORDER

This matter comes before the court on the defendants' motion to dismiss or, in the alternative, for summary judgment, and the plaintiff's cross-motion for summary judgment. For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

ORDERED that plaintiff's motion for summary judgment as to Count I is GRANTED and defendants' corresponding motion to dismiss or, in the alternative, for summary judgment, as to Count I, is DENIED.

It is further ORDERED that the adverse action report concerning plaintiff Simpkins be removed from the National Practitioner Data Base administered by the United States Department of Health and Human Services pursuant to the Health Care Quality Improvement Act of 1986, 42 U.S.C. § 11101 *et seq.*

It is further ORDERED that as to Counts Two, Three, Four, and Five defendants' motion to dismiss or, in the alternative, for summary judgment is GRANTED and the plaintiff's motion for summary judgment is DENIED as to Counts Two, Three, Four and Five. Counts Two, Three, Four and Five are hereby DISMISSED.

SO ORDERED.