**Arif M. OMAR, M.D., FACC, Appellant,**

v.

**JEWISH HOSPITAL HEALTHCARE SERVICES, INC., and David R. Watkins, M.D., Appellees.**

No. 2003–CA–000255–MR.

Court of Appeals of Kentucky.

Feb. 27, 2004.

Discretionary Review Denied by Supreme Court Feb. 9, 2005.

Kent Masterson Brown, Christopher J. Shaughnessy, Lexington, KY, for appellant.

Sharon K. Hager, Edward L. Schoenbaechler, Hall, Render, Killian, Heath & Lyman, P.S.C., Louisville, KY, for appellees.

Before JOHNSON and KNOPF, Judges; and MILLER, Senior Judge.[1]

## OPINION

KNOPF, Judge.

On July 2, 2002, Dr. Arif Omar, M.D., resigned from the medical staff of Jewish Hospital in Louisville. By letter dated July 9, 2002, the hospital informed him that because the quality of his care was under investigation, the hospital was obliged by federal regulation to reject his resignation. The hospital was referring to the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101 et seq.

As the hospital later acknowledged, the HCQIA does not impede Dr. Omar's resignation, but it does require the hospital to report resignations tendered while the physician is under quality-of-care investigation to the Kentucky Board of Medical Examiners and the National Practitioners Data Bank. On August 8, 2002, Dr. Omar brought suit against the hospital and its medical staff seeking a declaration that he had not been under investigation when he resigned and an order enjoining the hospital from filing an HCQIA report. By order entered January 31, 2003, the Jefferson Circuit Court granted summary judgment for the hospital and dismissed Dr. Omar's suit. It is from that ruling that Dr. Omar has appealed. He contends that the hospital and the trial court have misapplied the HCQIA. We disagree and affirm.

Dr. Omar, whose specialty is cardiology, was granted provisional staff privileges at Jewish in April 2001. His practice included interventions, such as cardiac catheterizations. In the spring of 2002, staff of the cardiac catheterization lab expressed concern over the quality of Dr. Omar's care. These concerns came before the Departments of Medicine and Family Practice Quality Assessment and Improvement Committee (QA & I) at its meeting on May 1, 2002. The committee reviewed five of Dr. Omar's cases and concluded that they presented "major quality of care concerns." The committee recommended that, beginning immediately, all of Dr. Omar's patient care be supervised and that all of his cases from the beginning of 2002 be submitted to independent review.

These recommendations were heard and adopted that same day, May 1, 2002, by a special adhoc committee of the Medical

1. Senior Judge John D. Miller sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

Executive Committee. Following the Medical Executive Committee's meeting, the presidents of the hospital and the medical staff signed a letter to Dr. Omar, dated May 1, 2002, informing him of these developments and inviting him to address the Medical Executive Committee at its regular meeting on May 7, 2002. By letter dated May 2, 2002, the Chair of the QA & I Committee questioned Dr. Omar regarding the five cases the QA & I Committee had reviewed and advised him that all of his cases for the year were to be submitted to independent scrutiny.

On May 7, 2002, Dr. Omar and other cardiologists addressed the Medical Executive Committee concerning the five cases. At the conclusion of the meeting, the full committee adopted the recommendations of the special adhoc committee that Dr. Omar's practice be reviewed and supervised.

In due course, an outside reviewer submitted a report, consideration of which was on the agenda of the Medical Executive Committee's July 2, 2002, meeting. Shortly before the meeting commenced that afternoon, Dr. Omar tendered his resignation to the hospital and to the medical staff. At the meeting, the committee heard the report, which was critical of Dr. Omar's practice, and concluded that the hospital would revoke Dr. Omar's catheterization and other interventional privileges with the possibility of reinstatement upon Dr. Omar's successful completion of additional training. It was the hospital president's July 9, 2002, letter informing Dr. Omar of this decision and mentioning the hospital's obligation under federal law that prompted Dr. Omar's suit.

In 1986, Congress passed the HCQIA to facilitate the effective peer review of physicians. Among its purposes, the HCQIA seeks to prevent incompetent physicians from relocating without disclosure of their previous records.[2] The HCQIA requires health care entities to report to the state Board of Medical Examiners and the National Practitioner Data Bank any professional review actions that adversely affect a physician's clinical privileges for longer than thirty days, the physician's name, the reason for the action, and other relevant information.[3] That information is then made available to other health-care entities upon request if the physician applies for clinical privileges or appointment to a medical staff.[4]

To prevent physicians from circumventing the reporting requirement by resigning in anticipation of an adverse professional review action, the Act also requires a report by

> [e]ach health care entity which ... (B) accepts the surrender of clinical privileges of a physician (i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or (ii) in return for not conducting such an investigation or proceeding.[5]

█ The hospital contends that under this provision of the HCQIA it is obligated to report Dr. Omar's resignation. Dr. Omar maintains that this provision does not apply to him because he was not "under an investigation" when he resigned. Dr. Omar correctly notes that routine review of a physician's cases does not trigger the HCQIA's reporting requirements.[6]

---

2. 42 U.S.C. § 11101(2).

3. 42 U.S.C. § 11133(a)(1)(A) & (C); 45 C.F.R. pt. 60.

4. 42 U.S.C. § 11137(a).

5. 42 U.S.C. § 11133(a)(1).

6. *Simpkins v. Shalala,* 999 F.Supp. 106 (D.D.C.1998).

He insists that the Medical Executive Committee did not comply with medical staff bylaws governing the commencement of investigations and therefore that the committee's review of his practice must be deemed merely routine.

The trial court rejected this characterization, however, and ruled that even if the Medical Executive Committee failed to give Dr. Omar formal notice of an investigation as contemplated by the bylaws or denied him an opportunity to present information to the independent reviewer, the medical staff's and the hospital's scrutiny of his practice clearly amounted to an investigation for the purposes of the HCQIA. We agree.

As the parties have noted, the HCQIA does not define "investigation," but guidelines issued by the Department of Health and Human Services make it clear that Dr. Omar's case was an investigation under the HCQIA and not merely an instance of routine case review. According to the guidelines, factors indicative of an investigation include scrutiny carried out by the health-care entity as opposed to an individual on the staff, scrutiny focused on the physician and · concerned with his professional competence, and scrutiny that is the precursor to a professional review action.[7]

 In *Simpkins v. Shalala*,[8] upon which Dr. Omar relies, all of these factors favored the physician, who sought ex-

pungement of an HCQIA report, as did the fact that none of the hospital's bylaws regarding complaints had been invoked or complied with. Here, however, there was at most a technical failure to abide by the hospital bylaws regarding investigations,[9] and all of the factors listed by the federal agency favor the hospital. The review was conducted by the entity, not by a staff member; it was focused on Dr. Omar's competence, about which Dr. Omar's peers had "major concerns"; and it was the precursor to a professional review action, a negative action in this case that was only foreclosed by Dr. Omar's last-minute resignation. We agree with the hospital and the trial court that this is precisely the sort of resignation-under-investigation that the HCQIA requires to be reported.

Accordingly, we affirm the January 31, 2003, order of the Jefferson Circuit Court.

ALL CONCUR.

---

7. National Practitioner Data Bank Guidebook, p. E–19.

8. 999 F.Supp. 106 (D.D.C.1998).

9. Although Dr. Omar was not served with a writing from the Medical Executive Committee stating "you are under investigation," the committee did notify him in writing that it had serious concerns about his competence and was therefore undertaking a thorough review of his practice. The presidents' letter of May 1, 2002, and the Medical Executive Committee decision of May 7, 2002, should

have put Dr. Omar on notice that he was under investigation. The fact that the Committee did not seek additional comment from Dr. Omar following his presentation at the May 7 committee meeting does not suggest otherwise. The bylaws require only that the physician under investigation be interviewed as the investigator deems appropriate. That Dr. Omar was not invited to address the outside consultant does not violate this requirement and in no way suggests that the scrutiny of Dr. Omar's practice was merely routine.